No. 46,503

Gary J. Cooper and Paul D. Cooper, by and through their father, natural guardian and friend, Perry Cooper, and Perry Cooper, individually, *Appellees*, v. Merl M. Eberly, d/b/a Merl Eberly Recreation Farms, *Appellant.*

(508 P. 2d 943)

Opinion filed April 7, 1973.

*Richard C. Hite,* of Kahrs, Nelson, Fanning, Hite & Kellogg, of Wichita, argued the cause, and *Philip Kassebaum* of Kassebaum & Rees, of Wichita, was with him on the brief for the appellant.

*Brian G. Grace,* of Weigand, Curfman, Brainerd, Harris & Kaufman, of Wichita, argued the cause, and *O. J. Kaufman,* of the same firm, was with him on the brief for the appellees.

The opinion of the court was delivered by

SCHROEDER, J.: This is an action based on common law negligence and arose out of injuries received by the plaintiffs when an automobile driven by the plaintiff Gary Joe Cooper struck a horse belonging to the defendant on a regularly traveled highway in Sedgwick County, Kansas. The case was tried to the court, sitting without a jury, and resulted in a judgment for the plaintiffs in the sum of $56,035.03. Appeal has been duly perfected.

The issues on appeal challenge the sufficiency of the evidence to sustain the trial court's findings regarding negligence and contributory negligence; the extent of the plaintiff Gary Joe Cooper's injuries; and the admission of evidence.

On Thanksgiving Day, November 28, 1968, Gary and Paul Cooper were returning to Wichita after spending Thanksgiving Day in St. John, Kansas, with their grandparents. On the return trip to Wichita, Paul Cooper was asleep and Gary Cooper stated he was driving east on the 21st Street Road at dusk with his headlights on. He came over a "small rise" and saw "some objects silhouetted in the road." He did not know what they were but didn't want to hit them. He did not know how far he was from the first object at the time he came over the rise. He did not think he could have stopped in time to avoid striking the first object in the roadway at the time he first saw it. Furthermore, he did not know how fast he was driving at the time.

In order to avoid hitting the first object Gary Cooper swerved to the right so that part of his car was off the roadway. He drove along the shoulder of the roadway for some distance. The ride was bumpy so he accelerated in order to control his car and get it back on the road. At no time while he was driving along the shoulder of the roadway did he apply his brakes or make any effort to do so.

As he was driving along the shoulder of the roadway, Gary Cooper passed the first object on the highway. He then pulled back onto the roadway and observed another object in his path. That object turned out to be the horse with which he collided. He did not know how far the horse was from his car when he first saw it. He testified that he could not have stopped in time to avoid striking the horse after he first saw it. He applied his brakes, or at least made a move to apply his brakes, only at the last second before colliding with the horse.

The accident took place near the home of Merl M. Eberly (defendant-appellant), whose farm is located on the 21st Street Road west of the city of Wichita. Merl Eberly owns 85 acres in the north half of the section in which he resides and leases the balance of the north half of the section. He also leases an irregularly shaped 35-acre tract in the south half of the section. That 35-acre tract lies generally in the northeast corner of the southwest quarter of the section. The particular tract is referred to throughout the trial as the "south 35-acre tract." This is the tract where Eberly's horses were pastured on November 28, 1968, the day of the accident.

Merl Eberly is 58 years of age and was doing business as Merl Eberly Recreation Farms on the day the accident took place. For this recreational business he utilized 70 acres of the land heretofore described. The Eberly's recreational activities commenced in 1954 and since that time they have gradually increased the number of horses on the premises. At the time of the accident they owned approximately 10 horses. Activities provided in connection with their recreational business included hayrack rides, horseback rides, picnicking, swimming, swimming lessons, day camp operations, and overnight camping. Charges were made for the use of their facilities. The defendant employed a number of persons to assist in his business and, among other things, to act as guides for people on trail rides. The horseback riding, riding lessons, trail rides and hayrack rides were operated throughout the south 35-acre tract.

After the accident it was found that a gate was open in the fence

surrounding the south 35-acre tract where the horses had been confined. There was no evidence which would tend to prove how or why the gate happened to be open.

There were three gates located in the south 35-acre tract, numbered 3, 6 and 7. In 1963 gate No. 7 was wired up and closed off during a major repair and rewiring of the fence. Prior to being wired up, gate No. 7 had been secured with a padlock. Gate Nos. 1, 3 and 6 on the Eberly premises were the only gates which led to unfenced fields or pastures, and then to highways in the area. Gate Nos. 1 and 3 were secured with padlocks, *but gate No. 6 was secured only with a wire loop.* Gate No. 6 was located within a few feet of trails frequently used for horseback riding and hayrack rides. Gate No. 6 is near the center of the section in which the land leased by the defendant is located and it is not adjacent to any roadway. The cultivated land bordering the south 35-acre tract is not fenced. There is no evidence that the horse involved in the collision here in question could have escaped from the south 35-acre tract at any place other than through gate No. 6, which was found lying wide open after the accident. It appeared as if someone had opened the gate wide and left it open. The gate had not fallen down in place as if it had become unlatched.

The defendant had no regular schedule or practice of checking the gates and fences. He testified that he or one of his employees would check when riding through the area with customers to see that the gates were all closed and that the fence was in good shape. Six days before the accident, there were two hayrack riding groups using the defendant's facilities. One group was made up of 25 people and the other between 30 and 50 people. Five days before the accident there were two separate reservations of six people each for horseback riding at the defendant's facilities, and later that same day two separate groups of 30 people each for hayrack rides. Thus, a total of between 127 and 147, business customers of the defendant were on the property involved within a few days before the accident. No check was made of the fences and gates on the defendant's property from the date of the last business activity until the day of the accident. But Mr. Eberly testified he personally checked gate No. 6 when the last hayrack ride went by the gate in the south 35-acre tract on the weekend preceding Thanksgiving Day, and the gate was closed.

At one time the south 35-acre tract was posted with signs in the area of gate No. 6 warning against trespassing and hunting,

*but there is no evidence that these signs were present on the day of the accident.* Testimony indicated the signs previously posted had been shot off. The defendant denied that he had any knowledge of how gate No. 6 could have gotten open, but acknowledged that there was no one at home on the Thanksgiving Day in question to receive any call that their horses were out. The Eberlys had gone to Whitewater, Kansas, for the Thanksgiving Day, and their recreational facilities were not being operated on that particular day. The defendant testified he had no knowledge or evidence that a trespasser or hunter had either been on his property or had left gate No. 6 open.

Over objection the trial court admitted testimony that the defendant's horses had escaped from his recreational facilities on prior occasions between 1962 or 1963 and up to the time of the accident. The defendant's son Ray Eberly, testified that the only time horses got out of the south 35-acre tract in the past was when someone left the gate open.

The defendant testified as to prior trespassers on his property as follows:

"Q. Now, in the years that you have lived in this section and near the Cowskin Creek, have you had people coming on your property without permission?

"MR. GRACE: I object, Your Honor; do not believe this question calls for and answer which is probative of any issue which is present in this lawsuit.

"THE COURT: Overruled.

"Q. You can answer, Mr. Eberly. Have you had people that would come on your property without permission?

"A. Yes.

"Q. Has this happened more than once over the years?

"A. Yes.

"Q. Can you describe this situation to the Court?

"A. Well, I'll describe one or two.

"Q. Just tell the Court; does this happen?

"A. This happens.

"Q. How frequently does it happen?

"MR. GRACE: Excuse me, Your Honor. May the record reflect we have a continuing objection to this entire line of questioning?

"THE COURT: Yes, sir.

"Q. You can answer. Can you give us any idea of how often this might happen? I know you are going to have to talk in approximate figures.

"A. It is frequent. They come from the Thirteenth Street road up the creek, or the Twenty-first Street road. It seems to be considered as timber land, public property to this extent that people, when they see timber, and we have them in there frequently. I won't say there is someone through every

week or every two weeks, but I see unknown tracks in an area that I know we nor our people have been in. I see results of them being there.

"Q. On occasion have unknown persons interfered with your fences in any way?

"MR. GRACE: Your Honor, I'm not sure that this necessarily constitutes the same type of question. We would object to it and a continuing objection to any 'unknown persons' and their activities.

"THE COURT: Very well; your objection is noted. Overruled.

"A. State again the question, please.

"Q. On occasions, have unknown persons interfered with the fencing around your property?

"A. Yes.

"Q. What has happened?

"A. We have had fences cut, wires cut. We have had gates left open."

The trial court found that as a result of the accident all three plaintiffs suffered injuries and damage; that plaintiff Perry Cooper, father of Paul and Gary Cooper, owned the automobile involved in the accident and was damaged in the amount of $1,133.50; that the plaintiff Paul Cooper was injured and suffered damage in the amount of $103.68; and that the plaintiff Gary Cooper was injured and had up to the time of trial incurred medical bills in the total amount of $3,741.84; that he suffered a broken neck as a result of the accident and the doctor's testimony established that he would be restricted in his activities for the balance of his life and probably would develop an arthritic condition in his neck as a result of the injuries. In the doctor's opinion Gary would suffer a 20% permanent general bodily disability. The trial court found Gary had a wage loss of $1,056.00 and awarded damages to Gary in the total sum of $54,797.85.

The trial court found the defendant was guilty of negligence, and that the plaintiff Gary Joe Cooper was not guilty of contributory negligence.

In its conclusions of law the trial court found the defendant was negligent in allowing the horses involved in this case to "run at large" in violation of K. S. A. 47-122 and 47-123. The trial court also concluded:

"That the defendant was not an insurer of the safety of the plaintiff, but that the defendant failed to take any reasonable safety precautions to prevent this accident from occurring."

The plaintiffs charged the defendant in their petition with a variety of specific acts of negligence. The final pre-trial order set forth ten specific acts of negligence. Among them were: Failure

to lock or secure gate No. 6 on defendant's property; failure to post "no hunting or trespassing" signs or to take any other action to prevent intrusion upon defendant's property of trespassers; and violating K. S. A. 47-101 *et seq.* (which, among other things, makes it unlawful for horses to run at large).

The acts of contributory negligence with which the plaintiff was charged by the defendant as set forth in the pre-trial order are: (*a*) Failing to stop or slow his vehicle in order to avoid a collision; (*b*) Failing to take proper action to avoid a collision after he knew, or should have known, that a collision was imminent; and (*c*) Failing to keep a proper lookout.

The pre-trial order also specified an issue of law relating to the legal sufficiency of the allegations of negligence set forth in the plaintiffs' petition.

The primary thrust of this appeal requires the appellate court to define the duty of care owed by the defendant to the plaintiffs under all of the facts and circumstances presented by the record.

But for the fact that the defendant's horses got onto the public road here in question there would have been no collision killing a horse and the plaintiffs would not have been damaged. This, however, is not the test of liability in a negligence case.

Negligence, to be actionable, must result in damage to someone, which result, in the absence of wantonness or *malus animus*, might have been reasonably foreseen by a man of ordinary intelligence and prudence, and be the probable result of the initial act. (*Cleghorn v. Thompson*, 62 Kan. 727, 64 Pac. 605.)

It is well established that before one can be held responsible for his negligent act the actor's negligence must be the proximate cause of the injury sustained. This leads to the fundamental law in negligence cases which was so aptly stated in the words of Justice Cardozo speaking for the court in the landmark case of *Palsgraf v. Long Island R. R. Co.* (1928), 248 N. Y. 339, 162 N. E. 99, where it was said:

". . . 'Proof of negligence in the air, so to speak, will not do' . . .

". . . The risk reasonably to be perceived defines the duty to be obeyed, and risk imports relation; it is risk to another or to others within the range of apprehension. . . ." (pp. 341, 344.)

The duty arising out of the relation between individuals, which imposes upon one person a legal obligation for the benefit of another, was discussed in some detail, together with the *Palsgraf* case,

in *Steele v. Rapp,* 183 Kan. 371, 327 P. 2d 1053. There general rules in tort law were discussed by this court with considerable detail. Further discussion herein will proceed upon the assumption that the reader is familiar with the case of *Steele v. Rapp,* supra.

Negligence is not actionable unless it involves the invasion of a legally protected interest, the violation of a right. In every instance before an act is said to be negligent, there must exist a duty to the individual complaining, and the observance of which would have averted or avoided the injury. The plaintiff who sues his fellow-man sues for a breach of duty owing to himself. The victim does not sue derivatively, or by right of subrogation, to vindicate an interest invaded in the person of another. (*Steele v. Rapp,* supra; *Elliott v. Chicago, Rock Island & Pac. Rld. Co.,* 203 Kan. 273, 283, 454 P. 2d 124; and *George v. Breising,* 206 Kan. 221, 477 P. 2d 983.)

The appellant relies upon *George v. Breising,* supra; and *Hendren v. Ken-Mar Airpark,* 191 Kan. 550, 382 P. 2d 288, for the proposition that at all times material herein K. S. A. 21-2436 made it a misdemeanor to open gates and leave them open without the consent of the owner of the land. It is argued that to hold Eberly was negligent for failing either to padlock or fence out gate No. 6 would seem to be tantamount to requiring him to anticipate unlawful acts; and that failure to anticipate the criminal acts of others is not negilgence.

The rule with which we are here concerned is stated in *Steele v. Rapp,* supra, as follows:

"The rule that the causal connection between the actor's negligence and an injury is broken by the intervention of a new, independent and efficient intervening cause, so that the actor is without liability, is subject to the qualification that if the intervening cause was foreseen or might reasonably have been foreseen by the first actor, his negligence may be considered the proximate cause, notwithstanding the intervening cause. (*Rowell v. City of Wichita,* 162 Kan. 294, 176 P. 2d 590; and *Emmerich v. Kansas City Public Service Co.,* 177 Kan. 443, 280 P. 2d 615.)" (Syl. ¶ 3.)

On the record here presented the intervening cause was the act of a third person in opening gate No. 6 and leaving it open.

Who opened gate No. 6 is a matter of speculation on the record here presented. Why gate No. 6 was open and left open is also a matter of speculation. But what is the risk reasonably to be perceived by one who conducts recreational activities with a number of horses confined in close proximity to a large city where public

highways are congested with vehicular traffic adjacent to the premises?

The record clearly established the recreational facilities of Eberly were used annually by thousands of customers and these people came to the recreational farm to do business with him. Most of these customers were young people, such as Boy Scouts, Girl Scouts, horseback riders and so forth. These recreational activities for youngsters have been conducted over a period of more than 10 years. Many in connection with the recreational activities came in close proximity to gate No. 6. The evidence established that Eberly was aware that gates on his premises had been left open in the past and that his horses had escaped. Eberly was also aware of the frequency of trespassers on the premises, particularly in the wooded area such as the south 35-acre tract here in question.

Without question horses unattended on a public highway, whether it be day or night, are a serious hazard to users of the public highway. Under the circumstances here presented a man of ordinary intelligence and prudence is charged with this knowledge.

The rule applicable to this case is stated in § 49, Restatement (Second) of the Law of Torts, as follows:

"If the likelihood that a third person may act in a particular manner is the hazard or one of the hazards which makes the actor negligent, such an act whether innocent, negligent, intentionally tortious, or criminal does not prevent the actor from being liable for harm caused thereby."

Comment *b* under the above restatement rule states:

"The happening of the very event the likelihood of which makes the actor's conduct negligent and so subjects the actor to liability cannot relieve him from liability. The duty to refrain from the act committed or to do the act omitted is imposed to protect the other from this very danger. To deny recovery because the other's exposure to the very risk from which it was the purpose of the duty to protect him resulted in harm to him, would be to deprive the other of all protection and to make the duty a nullity."

As applied to the facts in this case the likelihood that a third person may open gate No. 6 and leave it open, thereby permitting Eberly's horses to escape, makes Eberly's conduct in failing to padlock gate No. 6 and in failing to post "no hunting or trespassing" signs to prevent the happening of such event negligent. It is immaterial whether the opening of gate No. 6 by a third person was innocent, negligent, intentionally tortious or criminal.

If there is some probability of harm sufficiently serious that ordinary men would take precautions to avoid it then failure to take

such care is negligence. (*Gard v. Sherwood Construction Co.*, 194 Kan. 541, 400 P. 2d 995.)

Having given the initial tortious conduct—the failure of Eberly to padlock gate No. 6 and his failure to post "no hunting or trespassing" signs in the area of gate No. 6—it is reasonably foreseeable by a man of ordinary intelligence and prudence, on the factual situation disclosed by the record, that some third person may open gate No. 6 and leave it open thereby permitting the confined horses to escape into the unfenced cultivated area adjacent thereto and find their way to the public highway where motorists would be subjected to the risk of injury and damage caused by accidental collision with the horses.

On the record here presented Eberly owed a duty to the plaintiffs to post his premises with "no hunting or trespassing" signs and to padlock gate No. 6 which might be opened to unfenced adjacent land leading to a highway. Eberly's failure to comply with such duties, and the happening of the very event the likelihood of which made his conduct negligent, subjects him to liability.

The Supreme Court of California in *Richardson v. Ham*, 44 C. 2d 772, 285 P. 2d 269, had before it consolidated actions against owners of a bulldozer for personal injuries and property damage resulting when vandals started a bulldozer and the bulldozer ran wild. In the opinion the court said:

"It is contended, however, that even if defendants were under a duty to protect plaintiffs from injuries from operation of the bulldozer caused by ordinary intermeddlers, they were not under a duty to protect plaintiffs from intermeddlers who deliberately undertook to operate the bulldozer, or, in other words, that the intentional misconduct of the young men constituted a superseding cause of plaintiffs' injuries. (See Rest. Torts, § 448.) It is settled, however, that 'If the realizable likelihood that a third person may act in a particular manner is the hazard or one of the hazards which makes the actor negligent, such an act whether innocent, negligent, intentionally tortious or criminal does not prevent the actor from being liable for harm caused thereby.' (Rest. Torts, § 499; *McEvoy v. American Pool Corp.*, 32 Cal. 2d 295, 298-299 [195 P. 2d 783]; *Benton v. Sloss*, 38 Cal. 2d 399, 405 [240 P. 2d 575].) The possibility of the intentional, wrongful misconduct that occurred in this case was not so remote as not to constitute 'one of the hazards' that would justify the conclusion that defendants' failure to lock the bulldozer was negligent. Accordingly, defendants' duty to protect plaintiffs from injuries caused by the uncontrolled and unauthorized operation of their bulldozer included a duty to protect plaintiffs from the intentional misconduct of the young men, and such misconduct did not therefore constitute a superseding cause of plaintiffs' harm." (p. 777.)

The cases upon which the appellant relies (*George v. Breising*, supra and *Hendren v. Ken-Mar Airpark*, supra) which hold that one

is not bound to anticipate the criminal act of another are embraced within § 448 of the Restatement (Second) of the Law of Torts, and are thereby distinguishable from cases, such as here, which fall under § 449 of the Restatement (Second) of the Law of Torts.

Furthermore, on the record here presented it cannot be said with any degree of certainty that an intervening criminal act occurred. This would be the situation only in the event that a trespasser eighteen years of age or older opened the gate and left it open. It would be a criminal act only by virtue of K. S. A. 21-2436, repealed, effective July 1, 1970. Patrons of the Eberly recreation farm riding horses on the Sunday preceding the Thanksgiving Day here in question may have opened the gate to go into the open cultivated land to ride their horses, and upon returning may have left the gate open. A trespassing child or children under the age of eighteen years, hunting or picnicking on Thanksgiving Day in the area, may have opened the gate and left it opened. On the record here presented the appellees were not obligated, in their burden of proof, to establish who opened the gate in question and left it open.

The evidence presented by the record is sufficient to sustain the trial court's conclusion that the appellant failed to take any reasonable safety precautions to prevent the accident in question from occurring.

The record, however, does not support the trial court's conclusion that Eberly was negligent in allowing the horses involved to "run at large" in violation of 47-122 and 47-123, *supra.* These horses were not permitted by Eberly to run at large within the meaning of the statute as that term has been defined in *Wilson v. Rule,* 169 Kan. 296, 219 P. 2d 690 and *Abbott v. Howard,* 169 Kan. 305, 219 P. 2d 696.

In the foregoing cases "running at large" was defined to mean something more than "merely being unattended." The ultimate conclusion of the court was that in such cases the plaintiffs have the burden of proving that an animal is loose or unattended because its owner had failed to use due care in enclosing it. Nothing less than proof of such negligence makes out a *prima facie* case. In short, the statute does not require absolute security and leaves the burden of proof of negligence upon the plaintiff.

In *Clark v. Carson,* 188 Kan. 261, 362 P. 2d 71, the decisions

in *Wilson* and *Abbott* were reaffirmed by approving, as a correct statement of the law, an instruction which stated:

"As used in the Statute, 'running at large' is the strolling, without restraint or confinement, as wandering, roving and rambling at will without restraint. Suffering or permitting an animal to go at large implies knowledge, consent, or willingness on the part of the owner, or such negligent conduct as is equivalent thereto; but does not comprehend a case where animals escape from their owner, after due precaution to secure them has been taken, and without fault or negligence on his part, and he makes immediate and suitable efforts to recover them." (p. 265.)

(For annotations on the subject see 34 A. L. R. 2nd 1285 and Later Case Service; see also 59 A. L. R. 2nd 1328, p. 1340.)

In our opinion the intervening act of a third person or persons in opening gate No. 6 and leaving it open was sufficient to insulate the appellant from the statutory charge of suffering or permitting horses to go at large.

The appellant contends the introduction into evidence of prior escapes of his horses was improper in that it permitted the trial court to infer negligence on the date of the accident.

In the appellant's opening statement to the court he advised the trial court that over a period of 10 to 15 years the horses may have escaped on one or two occasions because of floods and maybe once or twice more because of a tree falling over a fence. Also during the examination of various witnesses, the appellant sought to adduce evidence concerning infrequent prior escapes of horses upon which he hoped to base an argument that he had no duty to prevent later escapes by his horses.

It was the appellee's contention that such evidence of prior escapes of the horses was introduced for the limited purpose of establishing notice to the appellant of possible danger, thereby establishing a duty on the appellant's part to take reasonable safety precautions to prevent the future escapes of his horses.

In arguing the point to the trial court as a result of the appellant's objections the appellee stated,

". . . [W]e *feel that the question of prior conduct of the defendant's animals* connected with this recreational facility over a period of time immediately preceding the accident *is relevant to establish the circumstances surrounding which the defendant had a duty to control his livestock.*

"Defendant has testified in certain matters in his deposition concerning prior escapes of his livestock and concerning his security precautions to prevent such, and *I intend to show the fact there were horses out on other occasions, there was a duty on the defendant commensurate with that risk, and the defendant failed to discharge that duty.* . . ." (Emphasis added.)

It is apparent the appellee offered such evidence for the limited purpose of establishing *the duty of the appellant* to guard against accidents involving users of the highway as a result of his business operation.

Eberly's knowledge that his horses had on previous occasions been allowed to escape into areas of traveled highways is a key to the foreseeability of danger from subsequent escapes of his horses, and hence is an important fact in establishing the duty of Eberly to take reasonable precautions to prevent future escapes of his horses. (See, K. S. A. 60-455.)

Actually, the appellant raised this issue in the trial court by his efforts to minimize the frequency of prior escapes by his horses. Under these circumstances error, if any, was invited by the appellant and he cannot be heard to complain on appeal. (*Elwood-Gladden Drainage District v. Ramsel,* 206 Kan. 75, 78, 476 P. 2d 696; and *Hawkins v. Wilson,* 174 Kan. 602, 605, 257 P. 2d 1110.)

After carefully reviewing the record we cannot say the conduct of Gary Cooper in driving the vehicle which struck the appellant's horse constituted contributory negligence as a matter of law. The question of contributory negligence is ordinarily a question to be determined by the trier of the facts. Here we cannot say the trial court erred in finding Gary Cooper to be free of contributory negligence.

The appellant contends there is no substantial competent evidence to support the trial court's finding that Gary Cooper will need further surgery.

It is the appellant's position on this point that the burden is upon the plaintiff to prove the nature and extent of his damages and that an award of damages cannot be based upon speculative or conjectural evidence.

Our review of the record indicates the appellant's contention with regard to the amount of the verdict rendered in favor of Gary Cooper lacks substantial merit. If, in fact, the testimony of Gary Cooper's attending ortheopedic surgeon had been conjectural, as the appellant now asserts, it was incumbent on him to object to the admission of such evidence at the time of trial, which he failed to do. The testimony of the surgeon was that Gary Cooper probably would need to have additional surgery consisting of a fusion of the cervical spine because of danger from motion of the neck. Evidence discloses that after release from the hospital Gary on two occasions experi-

enced numbness to his left side following a fall. On one occasion he went numb for a period of thirty minutes when he bumped his head and on another occasion his left leg became numb for a period of fifteen minutes after a fall. This was explained by the fact that there was some instability at the fracture site or between the two vertebrae involved which could be causing some direct pressure on the spinal cord. This was described as a very dangerous condition for Gary with definite recommendation that he have a cervical spine fusion to stabilize that joint.

The evidence was sufficient to support the amount of the verdict for Gary Cooper, absent any reference to probable future surgery.

Evidence disclosing the pain, suffering and disability of Gary Cooper was not controverted by the appellant either during the trial or on this appeal. The evidence of Gary's suffering included a period of two months in the hospital where he was immobilized by tongs inserted in his head and traction applied to those tongs; he had to be turned back and forth from his stomach to his back at four and one-half hours intervals during his entire hospitalization; he further suffered a loss of sixty pounds in weight, an inability to walk after having been dismissed from the hospital, numerous facial cuts including ultimate scaring over his left eye, and a substantial amount of pain associated with the injuries of this magnitude. Insofar as his permanent disability is concerned, he will suffer the permanent loss of 20% of the use of his body for the remainder of his life. His probable life expectancy was stipulated to be 51.9 years. The evidence was quite clear that he would suffer associated pain throughout the rest of his life from these injuries and the arthritic changes which they will bring to him many years earlier than the average person.

Evidence disclosed that he runs the constant risk of quadriplegia or death from any future injury, and many of his former recreational pastimes and physical activities have had to be curtailed or eliminated entirely.

After having carefully reviewed the record in connection with the points asserted on appeal, we find the appellant has failed to make it affirmatively appear that the trial court committed reversible error.

The judgment of the lower court is affirmed.