No. 45,943

JAMES ALBRIGHT, a Minor, by and Through His Mother and Next Friend, Bedola M. Ross, *Appellant*, v. ROBERT D. McELROY, d/b/a BOB'S DITCHING SERVICE, et al., *Appellee*.

(484 P. 2d 1010)

Opinion filed May 15, 1971.

*Payne H. Ratner, Jr.*, of Ratner, Mattox, Ratner, Ratner and Barnes, of Wichita, argued the cause, and *Patrick L. Dougherty*, of the same firm was with him on the brief for the appellant.

*Paul Kitch*, of Fleeson, Gooing, Coulson and Kitch, of Wichita, argued the cause, and *Donald R. Newkirk* and *Richard I. Stephenson*, of the same firm were on the brief for the appellee.

The opinion of the court was delivered by

HARMAN, C.: This appeal is by a youthful plaintiff from summary judgment rendered against him in his action for damages resulting from a fall into an excavation made by defendant.

Briefly stated, so far as now pertinent, plaintiff's petition alleged that defendant was engaged as a subcontractor on a construction job for the Grace Lutheran Church located near Pawnee and Hillside streets in the city of Wichita and as such agreed to perform certain excavation work necessary for installation of a sanitary sewer; that on July 18, 1968, defendant caused a large excavation to be made on an easement adjoining the church property and in close proximity to Pawnee street, and upon completion permitted the excavation to remain open but installed two small

barricades with two small lights near it; that the barricades were inadequate to warn pedestrians concerning the location and dangerous character of such excavation; on July 18, 1968, about 10:00 p. m. plaintiff was walking along the north side of Pawnee when he fell into the excavation and suffered severe injuries, such occurrence being proximately caused by defendant's negligence.

Defendant filed his answer admitting he was engaged as a subcontractor to perform certain excavation work at the construction site and that plaintiff sustained some injury at the approximate time and place in question but denying defendant was guilty of any negligence causing the injury. Defendant also alleged contributory negligence.

In sustaining defendant's motion for summary judgment the trial court had before it the pleadings, answers to interrogatories and certain discovery depositions. The latter included those of plaintiff, the five boys who accompanied him at the time of the incident and the defendant.

These depositions disclosed that on July 18, 1968, defendant and his employees, pursuant to specifications furnished by the city of Wichita, had dug a large hole on the south side of Pawnee street, across from the church, for the purpose of building a manhole there and laying a drain across the street northward to the church. The hole was about twelve by fourteen feet in size and from fourteen to twenty feet in depth. It was about one foot from the south edge of Pawnee street but had a twenty-four inch wide notch on the north side which came within six or eight inches of the side of the asphalt street. The hole was located on a twenty-five foot parking easement. A pathway on the south side of the hole was used by pedestrians but there was no sidewalk.

Defendant testified he and his employees had left the excavation between 4:30 and 5:00 p. m. on the day in question; before leaving they had placed four barricades around it, one on each side. Two more barricades were placed on the street, one being fifty-feet east of the hole and the other fifty feet west of it. The barricades were of a wooden sawhorse type construction with a yellow flashing light mounted on each. Some of the dirt had been trucked away and some remained about the hole.

Plaintiff, who was nearly fourteen years of age at the time he was injured, testified that earlier in the day he and a friend had gone to a hamburger stand at Hillside and Pawnee and had observed construction in progress at the church but did not notice

the hole; about 9:00 p. m. he had again gone to the hamburger stand with three other boys; en route they did not go past the church site but took a short cut through some yards; he had no recollection of events occurring that night after they left the hamburger stand.

The other five youths, who ranged in age from thirteen to fifteen years, testified substantially that they left the hamburger stand together with plaintiff about 9:30 to 10:00 p. m. walking east down Pawnee street. They noticed the barricades, flashing lights and the hole. The boys' testimony varied as to the exact number and location of the barricades and as to the precise manner in which plaintiff fell into the hole except that he went in where the notch was made near the edge of the street. The boys had remained about the hole several minutes before plaintiff fell in and talked about taking one of the yellow lights. Plaintiff was facing south when he went into the hole. One boy testified there was no barricade on the north side of the hole. Rocks were tossed into the hole to see how deep it was. Several of the boys had gone by the hole earlier in the day and knew it was there. One boy gave the following testimony (plaintiff, whose full name is James Christopher Albright, is referred to throughout as Chris):

"Q. Did you see Chris fall into the hole?

"A. I saw him while he was falling, I didn't see him slip or anything.

"Q. Before he fell, did you tell him there was a hole there?

"A. He knew there was a hole there.

"Q. How did he know that?

"A. Well, he was kind of fooling around, he wasn't—you know, he was—I don't know, really know what he was doing, but he knew there was one there, he was running around it, or something, while we were walking on ahead.

"Q. You mean he was playing around the hole?

"A. Yes.

"Q. Before he fell?

"A. Yes, I am pretty sure he was.

"Q. Did you see him?

"A. Yes, he was sitting there—there is a little place that went out, you know, about wide enough for a ladder, I don't know if that's what it was used for or not, next to the street. And he was setting there, so he knew there was one there, with his feet danglin' into the hole.

"Q. He was sitting on the north—

"A. North, yes.

"Q. —end of the hole with his feet dangling into the hole?

"A. Yes, he was.

"Q. I assume he was facing to the south?

"A. Yes.

"Q. And you turned around, you saw him slip from that position into the hole?

"A. Well, he said, 'Oh', or something, when he slipped in. I don't know if he slipped in that position or not. That's when he was about beside me and he was fooling around by the hole. And we walked on and I heard him say, 'Oh', and I saw him slip down into the hole.

"Q. Had he gotten to the hole before you did?

"A. I don't know, I doubt it, he might have.

"Q. But you saw him sitting there just before the fall?

"A. Yes.

"Q. How long before the fall?

"A. Oh, 30 seconds.

"Q. And he was playing around the hole prior to that time?

"A. Well, I don't know if he was playing around it, but he was around the hole, or something, talking around it.

"Q. He was what around the hole?

"A. Talking around the hole and everything.

"Q. What was he saying?

"A. I don't know.

"Q. Had he been to the south end of the hole?

"A. I don't know, I doubt it.

"Q. Okay. He was playing around the north edge of it then?

"A. Uh-huh.

"Q. Was he throwing anything into the hole?

"A. I don't remember, I doubt it.

"Q. Can you be a little bit more specific of what he was doing about the hole other than sitting and playing around it?

"A. No, I can't. No, I can't. I just know he was around the hole for, well, a little while, and then he set down as we walked on, and he fell in. I don't know how he fell in or anything.

"Q. Can you tell me exactly what part of the hole, where he was when he fell?

"A. He was at the north, middle of the north side.

"Q. Okay. And you just saw him as he was slipping in?

"A. Yes, I did.

"Q. Could you see him [plaintiff] all right?

"A. Yes, I could see him all right.

"Q. So it wasn't so dark you couldn't distinguish him?

"A. No, there were street lights and everything, you could see all right.

"Q. There was enough light there wasn't any doubt to you who it was and you could see who it was that was going into the hole?

"A. Yes, that's right.

"Q. And the hole, itself, then had some light around it, then, didn't it?

"A. Well, as far as I know.

"Q. Well, the hole was black, I would assume?

"A. Yes.

"Q. You couldn't see down in the bottom?

"A. Yeah, yeah, the barricades.

"Q. But you could see the barricades and there was light around the hole. If you could see Chris, you could easily see the barricades, couldn't you?

"A. Yes, I could see the barricades.

.  .  .  .  .  .  .  .  .  .  .  .  .  .

"Q. Now, that was the thing I was going to ask you. Could you tell from the way he went in whether or not he was sort of jumping in to see how deep it was or whether he was actually—

"A. No, he knew it was pretty deep, he wasn't jumping in.

"Q. How do you know he knew it was pretty deep?

"A. Well, I don't know, we just knew it was. Maybe we talked about it. But we knew it was about 20 feet deep, I mean, because we knew the minute he slipped that he had been hurt. His brother ran right to the house. I mean, we didn't think it was 5 feet deep or anything.

.  .  .  .  .  .  .  .  .  .  .  .  .  .

"Before Chris Albright fell in, we had stopped by the hole and talked for a couple of minutes or so but I am not sure. We were starting to leave when he fell. We had stopped a little bit east and west of the hole, mainly to the north. I don't know what we talked about.

"Q. But all of you were around that hole for a period of a couple of minutes?

"A. Yes.

"Q. Chris say anything during that period of time to any of the boys about the hole?

"A. No, but I remember him—I don't know, he was trying to act big or something, I can't remember what he said, but he was showing off a little bit with what he was saying, not by his actions.

"Q. What did he say that made you think he was showing off?

"A. I can't remember. He was just acting big, I remember that.

"Q. You remember he was acting big?

"A. (Witness nods head in the affirmative)

"Q. Okay. Was he acting big in regard to the hole?

"A. Oh, not particularly.

"Q. Well, he was sitting there and he had his legs—

"A. Well, he was standing up then, what I was talking about and then he sat down.

"Q. What was he acting big about?

"A. I can't remember. He was smoking and acting real tough, I don't know."

Another boy testified:

"Q. Did you have any difficulty knowing and recognizing that a hole was there?

"A. I knew it was there, yes, sir.

"Q. When you saw the blinker lights?

"A. Yes, sir, I saw it on the way up.

"Q. Chris knew it was there?

"A. Yes sir, he probably did, the lights were all around and—

"Q. How long would you estimate that you stopped and talked in the vicinity of the hole?
"A. About five minutes, 5.

＊　＊　＊

"Q. I have another question here, David. I believe you answered one question to the effect that Chris knew there was a hole there, didn't he?
"A. Yes, he would have to have been nuts not to realize this, I mean, all the lights and everything.
"Q. How do you know that he knew there was a hole there?
"A. Well, anyone could have seen it, I mean we were standing about 4 feet from it, the blinker lights and—."

Still another boy gave this testimony:

"Q. Okay. What did these barricades look like?
"A. They were black and white with a yellow flasher.
"Q. You didn't have any problem seeing them, did you?
"A. No.
"Q. Were the flasher lights working?
"A. Yes.
"Q. How many flasher lights were there? Was there a flasher light on each barricade?
"A. I don't remember. I know there was one on the east and the west and one on the little one, on the one on the west side, the little one by the road, but I am not sure about the fourth one.
"Q. And you didn't have any problems then in the hole, did you?
"A. No.
"Q. You didn't have any problem seeing the hole, did you?
"A. I couldn't—I could just see the barricade where it was around it, but I didn't know the hole was there or nothing like that.
"Q. All right. You knew there were barricades around there?
"A. Yeah, I could see them.
"Q. You knew it said caution?
"A. Yeah.
"Q. You could read that?
"A. Yeah.

＊　＊　＊

"Q. Did you stop around the hole?
"A. You mean before we went there?
"Q. Yeah, before—
"A. Yeah, we was looking at the caution light, that one, and we were just standing there, you know, talking about that if it was, you know, you know, Chris was talking about, you know, if he had one of them lights, you know, what would happen if he got caught with it, and then we was back out on the road and we started on home—
"Q. Chris wanted to know what would happen to him if he took one of those caution lights?

"A. Yeah, we was talking—

"Q. Was he thinking about taking one?

"A. No, we was just talking about it, we weren't going to take any.

"Q. I think we all know you weren't going to take any.

"A. Yeah, yeah.

"Q. Did the idea kind of cross your mind?

"A. Yeah.

            *    *    *

"Q. Anyone else talk about taking any caution lights?

"A. No, we was just all talking together, I don't remember what was all said, but we was talking about—

"Q. What else did you talk about?

"A. That was about all.

"Q. Taking the flasher light?

"A. Just about the light.

"Q. And Chris was the one that wondered what would happen to him if he took one?

"A. Yeah.

"I don't remember Chris ever sitting down on the north edge of the hole and dangling his feet over the hole.

"Q. Now, are you saying he did or he didn't or that you don't know?

"A. I don't know.

"Q. He could have, couldn't he?

"A. Uh-huh.

"Q. You were out in the street?

"A. I was on the street.

"Q. All right, now was Chris on the street, too?

"A. He was right in front of me on the street.

"Q. All right, how far were you behind him?

"A. About a foot and a half, two feet.

"Q. Then what happened, Ernest?

"A. Then we just went on until—then he slipped down the incline, fell in the hole.

"Q. Did you see him slip?

"A. No, I just saw him disappear. He just—

"Q. Tell me how he disappeared.

"A. Well, we was walking, all of a sudden he went down, and so one of the boys, I don't remember who, had a flashlite and—

"The hole was about a half of block from the intersection of Hillside and Pawnee.

"Q. Half block? And I believe you said the flasher lights were working all right?

"A. Uh-huh.

"Q. And you knew what that meant, didn't you?

"A. Uh-huh, caution.

"Q. Chris knew what it meant, didn't he?

"A. Uh-huh.

"Q. And one of the reasons you didn't take that caution light is because you knew if you did it would be dangerous for somebody, isn't that right?
"A. Yes.
"Q. And Chris knew that, didn't he?
"A. Uh-huh.
"Q. Now, you knew it was going to be dangerous for somebody, didn't you?
"A. Uh-huh.
"Q. And you knew it because there was a dangerous condition there, isn't that right?
"A. Uh-huh."

Plaintiff's fifteen year old brother, who was one of the group, testified:

"Q. (By Mr. Stephenson) What did you talk about while you were walking back to your house?
"A. Things boys usually talk about and—
"Q. What are those things?
"A. Girls.
"Q. What else?
"A. And, oh, like when we got to the excavation somebody said 'What would happend if we swiped this light', the flashing light.
"Q. Who said that?
"A. I think it was either me or somebody else who said it, I am not sure, and we talked about it for a minute or two, and we were going to go on and then all of a sudden Chris stumbled over there, I don't know what it was, he stumbled and he fell and all I saw after that was his hand.
"Q. Did you hesitate or stop at the excavation site?
"A. About a minute or—

\* \* \*

"Q. (By Mr. Stephenson) What did you do while you were stopped?
"A. We were deciding whether or not to swipe the flashing light.
"Q. What did you decide?
"A. No.
"Q. Which flashing light were you talking about?
"A. There was two of them, just one of them.
"Q. Did it matter, you were just talking about a flashing light?
"A. A flashing light, yes.
"Q. Did you observe barricades around the site?

\* \* \*

"A. As far as I could see, it wasn't very well guarded with barricades.
"Q. (By Mr. Stephenson) Did you observe any barricades at the site?

\* \* \*

"A. I guess you could say I saw one.

"Q. So the two flashing lights you noticed were attached to a barricade such as in that picture, is that right?

"A. You couldn't rightly call them a barricade because they weren't very big.

"Q. Let's call them a support, then.

"A. Okay, a support.

"Q. That's what they were attached to that I just showed you?

"A. Yes.

"Q. And these so-called supports had caution lights on them, did they?

"A. You couldn't really see whether they were or not because the light was flashing off and on and it does not give off that much light and the place was very dark.

"Q. Now, were there two of these supports?

"A. Yes.

"Q. Okay. Now, where were they placed?

"A. There was one in the back of the hole and one right there in front.

"Q. And each of those had a flasher light on it?

"A. Yes.

"Q. And they were flashing?

"A. Yes.

\* \* \*

"Q. Now, you knew there was a hole there, didn't you?

\* \* \*

"A. I didn't know exactly what it was because, like I said, it was very dark and you couldn't see very well.

"Q. You knew those flashers and barricades were out there for some purpose, didn't you?

\* \* \*

"A. It could be there for almost anything.

"Q. (By Mr. Stephenson) You knew they were out there for some purpose?

\* \* \*

"A. I guess so.

"Q. (Mr. Stephenson) Okay. What purpose?

"A. Something the city had been working on, like asphalt that hadn't completely dried or an excavation, or something else like that, it could have been any number of things.

"Q. You understood it to be a warning, didn't you?

"A. Yes.

\* \* \*

"A. I figure I am old enough to know.

"Q. (By Mr. Stephenson) And you know they were there to warn you about something?

\* \* \*

"A. Yeah, any idiot ought to know that.

\* \* \*

"Q. What made you decide not to swipe a light?

"A. It wasn't right.

"Q. Did you discuss the fact that if you took one of the lights you might make it hazardous for somebody else?

* * *

"A. We didn't actually say that, but that was probably what was in the back of everybody's mind.

* * *

"Q. Did you know that there was construction going on in that area?

"A. I didn't know it until we saw the flashing lights.

"Q. What construction did the flashing lights reveal?

"A. Didn't reveal too much, didn't reveal hardly anything at all. The lights weren't bright enough. If you will notice, the lights are covered with a dark yellow covering and the light inside is not really bright enough, just enough so you can see it flashing off and on.

"Q. You revealed—I mean, it revealed enough light to you that you knew there was construction going on, I think I understood you that way?

* * *

"A. I am going to repeat myself. Any idiot ought to know what a flashing stands for.

"Q. (By Mr. Stephenson) You said you never did learn what it was about.

"A. A flashing light means some kind of danger.

"Q. Does Chris know that?

"A. He ought to.

"Chris was standing in the street reasonably close to the barricades and he stumbled over something in the street, like there was a whole bunch of dirt clods, big old hairy dirt clods all around.

"Q. So it is your testimony that Chris stumbled on a dirt clod in the street?

"A. I don't know that it was a dirt clod. He stumbled on something. Could have been over his own two feet, I don't know.

"However, I did not see him stumble and he stumbled on over into the pit.

"Q. (By Mr. Stephenson) All right. Before he left Sparky's would he know what a yellow flasher light meant?

"A. Before he left, yes, he would.

"Q. Would he know that was a warning?

"A. Yes, he would.

"I was about 50 feet from the excavation when I first noticed the flashing lights, they were not on the highway but were about 6 or 7 inches from the blacktop.

"The small barricade with the flashing yellow light on the north side of the hole was in the middle of that side.

"Q. How far to the north of this hole would you say that you boys stopped in feet?

"A. About a foot, foot and a half, somewhere around in there. See, the light was fairly close to the excavation. We decided whether or not to get it.

* * *

"A. I saw the light flashing when I was 50 feet away from it.

"Q. And the closer you get, the more light that light makes, isn't that right?

\* \* \*

"Q. (By Mr. Stephenson) Or did it get dimmer?

"A. Didn't get dimmer, as it approached.

\* \* \*

"A. It didn't get dimmer, you could see a little better.

"Q. (By Mr. Stephenson) It got brighter and you could see better?

"A. Yes, I could see better.

"Q. You could see it was attached to the barricade?

"A. Yes."

Before considering the merits of the appeal, review of our law relating to summary judgment is in order.

K. S. A. 60-256 (c) fixes the standard for determining whether summary judgment should be granted. In pertinent part it provides:

"The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

In *Lawrence v. Deemy,* 204 Kan. 299, 461 P. 2d 770, we stated (citations omitted):

"Generally before a summary [judgment] may be granted, the record before the court must show conclusively that there remains no genuine issue as to a material fact, and that the moving party is entitled to judgment as a matter of law. A mere surmise or belief on the part of the trial court, no matter how reasonable, that a party cannot prevail upon a trial will not warrant a summary judgment if there remains a dispute as to a material fact which is not clearly shown to be sham, frivolous, or so unsubstantial that it would be futile to try the case. The manifest purpose of a summary judgment is to obviate delay where there is no real issue of fact. A court should never attempt to determine the factual issues on a motion for summary judgment, but should search the record for the purpose of determining whether factual issues do exist. If there is a reasonable doubt as to their existence, a motion for summary judgment will not lie. A court, in making its determination, must give to the party against whom summary judgment is sought the benefit of all inferences that may be drawn from the facts under consideration.

"Regardless of how refined or sophisticated we attempt to state the summary judgment rule, we always return to the language of the statute itself (K. S. A. 60-256 [c]—there must remain 'no genuine issue as to any material fact.' A natural result of this requirement is that in negligence cases summary judgment is seldom proper.

". . . While the stage of the proceedings does not necessarily determine the propriety of summary judgment being rendered, ordinarily it should not be granted when pretrial discovery remains incomplete." (pp. 301-302.)

In *Hastain v. Greenbaum,* 205 Kan. 475, 481, 470 P. 2d 741, we quoted approvingly from 3 Barron and Holtzoff, Federal Practice and Procedure, rules edition, § 1234, as follows:

" 'Normally where the only conflict is as to what legal conclusions should be drawn from the undisputed facts, a summary judgment should be entered. [p. 128.] . . . It has been said that an issue is material if the facts alleged are such as to constitute a legal defense or are of such nature as to affect the result of the action, or if the resolution of the issue is so essential that the party against whom it is resolved may not prevail. . . . It has been said that a genuine issue is one which can be maintained by substantial evidence. Where the pleadings or proof of either party disclose that no cause of action or defense exists, a summary judgment may be granted. [pp. 131-132.] . . . A popular formula is that summary judgment should be granted on the same kind of showing as would permit direction of a verdict were the case to be tried. [p. 133.] . . . If there is any question as to the credibility of witnesses or the weight of evidence, a summary judgment should be denied.' (p. 134.)" (p. 481.)

Plaintiff urges the trial court erred in granting summary judgment because genuine issues of material fact remained unresolved. He stresses the disagreement as to the exact number and placement of the barricades at the time of his fall and also that the adequacy and sufficiency of the warning given was in question. He states the paramount issue was whether the protection and warning given by defendant was reasonably safe under the circumstances and that, therefore, the nature and the placing of the barricades around the hole was very material. He emphasizes the testimony of one or two of the boys to the effect there was no barricade on the north side of the hole, and also testimony that all of a sudden he fell into the hole.

Certainly there was never any dispute concerning the fact plaintiff fell into the hole. Defendant's answer specifically admitted plaintiff was injured at the time and place alleged, and all the evidence on the point verified the fall. In our view the exact or precise manner in which he fell was of little or no consequence. As already indicated, the petition charged negligence in the inadequacy of the barriers to warn pedestrians concerning the location and character of the excavations. The trial court ruled in effect that plaintiff had not shown actionable negligence on the part of defendant. Defendant now defends the judgment upon that ground rather than contributory negligence (without conceding the latter defense is inapplicable), asserting the record is conclusive that defendant discharged his legal duty to plaintiff.

Here all the witnesses to plaintiff's actions, and the conditions existing at the time, testified. Discovery apparently had been completed. Unfortunately for plaintiff, he was unable to supply more information. Giving to his evidence the most favorable

construction it reasonably bears, we must agree with defendant's contentions. The function of a warning is simply to convey knowledge or notice. The particular manner in which defendant warned plaintiff of the excavation is immaterial if in fact effective notice was given. It appears undisputed that such notice was given. The evidence was that lights on the barricades were flashing and the party of boys, including plaintiff, stopped several minutes at the excavation and even discussed taking one of the warning lights. It was undisputed plaintiff knew of the hole and actually sat down with his feet dangling in it—no testimony given was inconsistent with that fact.

Defendant was not an insurer of plaintiff's safety. As a contractor in the prosecution of work adjacent to a street, his duty was to exercise reasonable care for the protection of those rightfully in proximity to the work (65 C. J. S., Negligence, §§ 63[144], 84; see also, *Walton v. Noel Co.*, 167 Kan. 274, 205 P. 2d 928). Here the breach of duty relied upon was inadequacy of the warning as to the hole but it was established plaintiff had positive knowledge of the hole. Whatever the type of warning given was, it conveyed the message and thereby satisfied the requirement of reasonable care. The rule is that where proper notice or warning of a dangerous condition is given by one bound to give it, he generally is relieved for injury received by another who does not heed it (see 65 C. J. S., Negligence, § 89b). Notice or warning of the dangerous condition was given and under the proof we must hold that defendant was relieved from liability for injury received by plaintiff who obviously did not heed that warning and rendition of summary judgment was proper because no claim for relief existed.

The judgment is affirmed.

APPROVED BY THE COURT.