No. 43,290

LORA HENDREN (now Lora Frost), et al., *Appellants*, v. KEN-MAR AIRPARK, INC., *Appellee*.

(382 P. 2d 288)

Opinion filed June 8, 1963.

*Thomas A. Wood* and *Clifford L. Malone*, both of Wichita, argued the cause, and *Mark H. Adams, Charles E. Jones, William I. Robinson, J. Ashford Manka, Mark H. Adams, II, John S. Seeber* and *Philip L. Bowman*, all of Wichita, were with them on the brief for the appellants.

*Spencer L. Depew* and *Lawrence E. Curfman*, both of Wichita, argued the cause, and *Lawrence Weigand, Byron Brainerd, Charles W. Harris, Orval J. Kaufman, J. Ruse McCarthy, Donald A. Bell* and *J. L. Weigand, Jr.*, all of Wichita, were with them on the brief for the appellee.

The opinion of the court was delivered by

SCHROEDER, J.: This is a wrongful death action brought by the surviving spouse and children of Raymond Hendren who lost his life in the crash of an airplane. The airport operated by the defendant, Ken-Mar Airpark, Inc., is alleged to have been the airport where the fatal flight originated. Killed with Hendren was his brother-in-law, Glen St. Vrain, allegedly the pilot and a member of a flying club called Pegasus, which was the owner of the airplane involved.

Appeal has been duly perfected from an order of the trial court sustaining a demurrer to the plaintiffs' evidence.

The only question presented is whether the plaintiffs' evidence was sufficient to show any negligence on the part of Ken-Mar Airpark, Inc., and if negligent, that such negligence was the proximate cause of the crash and death of the plaintiffs' decedent.

At approximately 1:00 o'clock a. m. on January 9, 1960, a Piper airplane belonging to the Pegasus Flying Club and occupied by

the plaintiffs' (appellants') decedent, Raymond Hendren, and his brother-in-law, Glen St. Vrain, took off from the airport of Ken-Mar Airpark, Inc. (defendant-appellee) heading in a southerly direction. About a quarter of a mile south of the end of the runway the plane crashed into the middle of a field and burned. Both occupants were killed. St. Vrain, supposedly the pilot, was a member of the Pegasus Flying Club to which the airplane belonged. He held only a student pilot's license, having taken all of his instructions from Carl Buck, an employee of Ken-Mar. He had a maximum of twenty-five hours and thirty-five minutes flying time as shown by his log book. The last instruction St. Vrain had was on September 13, 1959, nearly four months prior to the fatal accident.

The Tri-Pacer airplane involved was purchased from Ken-Mar a year or two prior to the crash. It was hangared at Ken-Mar at the southwest corner, and was never kept at any other airport. The airport is located and operates several miles northeast of the city of Wichita, Kansas, as a private noncontrolled airport, which means there is no tower or method of controlling air or ground traffic of airplanes. The airport has existed as a private corporation operating for profit for approximately seventeen years. It consists of hangars along the west side of the airport and an administration building located in approximately the middle of the row of hangars along the west side. To the east of the hangars and administration building are runways for the take-off and landing of aircraft. Ken-Mar is engaged in the sale of aircraft, the doing of charter flying, airplane rentals, giving flight instruction, renting of hangar space for storing customer-owned aircraft, and the sale of oil and gas for aircraft. The airport is open at all times, day and night. At night the runway lights were turned on, and this was true of the night in question.

The Pegasus Flying Club rented hangar space from Ken-Mar where the airplane was kept while not in use. Gasoline and oil for the plane were procured from Ken-Mar, and various members of the club took flight instruction at Ken-Mar.

Some of the hangars at the airport have doors that open and close and others do not have doors. Most of the hangars which have doors cannot be locked. A board is kept in the administration building where the parties may leave their keys to the hangar doors, if any, and also the keys to the airplanes if they desire. They are not required to keep the keys at Ken-Mar. A teletype machine was

maintained in the administration building, which brings in weather data.

At the time of the crash there was a heavy fog in the area. The McConnell Air Force Base official weather report for the night in question indicates that there was generally an unlimited ceiling although for a very short time there were scattered clouds and a ceiling measured at 1,200 feet above surface. This surface weather observation also recites that during this time visibility was five miles. McConnell Air Force Base is located approximately six to seven miles south of the Ken-Mar airport.

The crash was discovered at approximately 9:00 o'clock a. m. on January 9, 1960, and was investigated by officers of the Sedgwick County sheriff's department and by the Civil Aeronautics Board. This investigation disclosed there was no mechanical or structural failure of the aircraft or in-flight distress prior to its impact with the ground. In addition, the aircraft prior to the flight had received proper care in accordance with Civil Aeronautics regulations.

It is not known who was flying the airplane at the time of the crash as the airplane was equipped with dual controls and could be piloted from either the right or left front seat. It was impossible to determine which occupant of the airplane occupied the right or left seat.

The evidence presented by the plaintiffs is to the effect that the crash of the airplane was caused by human error. Plaintiffs' expert witness, Charles F. Fisher, an experimental test pilot for the Boeing Company, after qualifying as an expert witness, testified in response to a hypothetical question outlining the facts in evidence, that in his opinion the crash of the airplane was caused when the pilot suffered a disorientation and lack of reference to the horizon and to the lights of the city, which condition is commonly called vertigo, at which time he lost control of the aircraft and inadvertently flew it into the ground. He further testified that the loss of the reference or horizon occurs when there is lack of proficiency of the pilot. Hendren had no pilot training whatever, and if it is assumed that St. Vrain was at the controls, he had only twenty-five and one-half hours flying time. According to the expert, St. Vrain could not possibly have achieved any instrument proficiency. He further testified on cross examination that vertigo could have happened to a reasonably proficient pilot

because of the particular conditions existing, unless he had had considerable training in instrument flying. The conditions existing to which he made reference were a heavy fog, darkness and turning away from the city lights.

There are no known witnesses to the fatal plane crash. The evidence disclosed St. Vrain and Hendren were known to have been drinking beer on the evening of January 8, 1960, having arrived at about 9:30 o'clock p. m. on that evening at the Paladin Bar located on South Broadway in the city of Wichita, Kansas. At about midnight St. Vrain and Hendren left the Paladin Bar and were not seen again until their bodies were found the following morning in and near the wreckage of the crashed airplane.

On the night in question a janitor-flight line attendant was the sole Ken-Mar employee on duty. He was doing some custodial clean-up work in the airport administration building on the night of January 8, 1960, and the early morning of January 9, 1960. He recalled seeing what may have been the Pegasus Piper airplane proceed down the airport runway to the south as if making a take-off early in the morning of January 9, 1960, but he did not at any time see the occupants of the airplane, and he had no knowledge of the identity of the occupants of the airplane. He testified that the field was illuminated with lights for the use of planes taking off and landing, and that only one plane took off after 12:00 o'clock on the night in question. He made no effort to determine who was piloting the airplane, or whether there were any passengers in it. In fact, he did nothing to ascertain the nature of the flight, the identity of the occupants of the plane, the lawfulness of the flight, nor did he take any other affirmative action with respect to the anticipated flight. Moreover, he was instructed by Mr. Isaacs, Ken-Mar's manager, that he was not to check the identity or qualifications of any persons taking an airplane which was not owned by Ken-Mar.

The manager and president of Ken-Mar, Mr. Isaacs, testified that he had taken his first flying in 1932 and had been quite active in aviation since 1944. In the early part of 1960 there were approximately 100 planes based at Ken-Mar, 25 owned by Ken-Mar and 75 by others. During this period there were approximately four or five flying clubs based at Ken-Mar. He testified that Ken-Mar did not control in any sense any of the flying clubs, their requirements or their use of the field. He had no knowledge of how many

members of the Pegasus Club, or of the other flying clubs, were not fully qualified as pilots, nor did he make any effort to determine whether they were qualified, although Ken-Mar furnished flying instruction to the flying clubs and their members. He expressed the opinion that Ken-Mar could not legally determine the qualifications of persons using the field, and did not check qualifications unless a party was going to fly one of Ken-Mar's airplanes, in which instance it did check his qualifications before the flight.

Mr. Isaacs further testified that the airport does not require any report to be made at the airport office before a plane takes off, nor is it customary to make such report. Ken-Mar has established no procedure for determining who may be taking an airplane from its field. Ken-Mar knows that on occasion an owner gives his key to someone else who pilots the plane. In some instances pilots have obtained their licenses through Ken-Mar, but Mr. Isaacs believes that Ken-Mar has no authority to check pilots to determine if they are properly licensed or not. Mr. Isaacs further testified that if persons desiring to use the field request advice concerning weather conditions, it would give such information to them or read the teletype weather machine for them, and state whether or not the weather was favorable for flying, but nevertheless, it was up to the individual to determine whether or not he would make such trip. Sometimes such persons took the advice and sometimes they did not and went on their way which, so far as Mr. Isaacs was concerned, was entirely up to them.

Edwin T. Tucker, president of Pegasus, Inc., at the time of the fatal crash, testified that the airplane was owned and maintained by Pegasus, Inc., and only hangared at Ken-Mar's airport on a rental basis. Tucker also testified that this airplane had all instruments necessary for night flying, and that Ken-Mar and the flying club had no arrangements between themselves as to the control of this airplane.

This action was instituted more than a year after the accident in question, and at the close of the plaintiffs' (appellants') evidence the trial court sustained a demurrer thereto, stating in its opinion that there was no evidence to show any negligence on the part of Ken-Mar, or if it was negligent that such negligence was the proximate cause of the crash and death. Appeal has been duly perfected from such ruling.

It is observed that no evidence was presented by the plaintiffs

to show that Ken-Mar or any of its representatives had any knowledge of who may have been in this particular airplane on this night; that no evidence was presented by plaintiffs to show any defects of any nature in or upon Ken-Mar's airport premises; and that no evidence was presented by plaintiffs to show the manner in which any other comparable private noncontrolled airport was operated.

The parties to this appeal admit that research has failed to disclose any decisions involving subtantially the same or similar facts to those in the instant case, and submit this case as one of first impression.

The appellants rely upon the general principles of negligence law to establish a prima facie case presented by the evidence. They cite *Blackmore v. Auer*, 187 Kan. 434, 357 P. 2d 765, quoting portions thereof which state the general principles of negligence law. They also cite *Rowell v. City of Wichita*, 162 Kan. 294, 176 P. 2d 590. The appellants suggest that circumstances demonstrated by the evidence give rise to additional duties on the part of the airport proprietor in this specific case. Those circumstances which the appellants suggest this court should judicially notice are as follows:

"(1) Flying an airplane requires a degree of skill and training not possessed by the ordinary man.

"(2) Flying an airplane at night requires a greater degree of skill and training than flying in the daytime.

"(3) Flying in fog or under other adverse weather conditions requires a greater degree of skill and training than flying in normal weather.

"(4) The safe use of an airport for take-off or landing depends upon weather conditions and upon the skill and qualifications of the pilot as well as upon the physical facilities of the airport.

"(5) The use of an airport for take-off or landing by a pilot of inadequate skill or training may reasonably be expected to produce damage and injury to the pilot and to others who are so unfortunate as to come into contact with him.

"(6) The airport from which the flight originates is the only place where the qualifications of the pilot can be checked and where the flight can be supervised to prevent injury to others."

The appellants argue: "The above circumstances, all drawn from common knowledge, by themselves, give rise to a duty on the part of the operator of an airport to ascertain the qualifications of the pilot who desires to make use of the facilities for take-off. They likewise create a duty to use all reasonable measures to prevent the use of the airport for take-off by a pilot not qualified to do so under the conditions of light and weather existing at the time.

They likewise create a duty to warn the pilot and any passenger of the hazard of taking off under the conditions then existing."

They also argue the evidence demonstrates the existence of other circumstances which give rise to additional duties on the part of the airport proprietor in this specific case. They argue: (1) That Ken-Mar knew, or should have known, that persons lacking qualification to fly under all conditions and with passengers had access to and the privilege of using airplanes hangared on the field and particularly the Pegasus plane; (2) that the airport proprietor knew, or should have known, that St. Vrain was not qualified to fly at night or with passengers; (3) that Ken-Mar kept its airport open and kept the runway and field lights on at a time when it knew that the use of the field by inexperienced or unqualified persons was hazardous; and (4) that Ken-Mar management recognized and in fact knew that the use of an airplane at the airport by a person not having sufficient qualification to fly is in fact hazardous.

The appellants argue the above circumstances demonstrate a duty on the part of Ken-Mar in this particular case; first, to ascertain the identity of any person taking the Pegasus plane at any time; and second, to ascertain the qualification of any person taking the Pegasus plane at night and under the conditions existing on the night of January 9, 1960.

It is not contended by the appellants that Ken-Mar did anything affirmatively which caused the crash of the airplane and the death of Hendren. It is, however, the appellants' complaint that Ken-Mar by the most serious type of omission, failed to meet its responsibilities and duties as the proprietor of a business establishment, wherein it possessed a superior knowledge to that of the decedent and to the public in general of the peculiar hazards involved in flying by inexperienced persons under adverse conditions.

The appellee, Ken-Mar, maintains the position that it had no duty, obligation, responsibility or authority to control in any manner the fatal flight in question; that the appellee violated no duty or obligation in failing to warn the appellants' decedent of a situation in which it had no knowledge or opportunity to so warn; and that the appellee had no physical means available to control the fatal flight or to restrict the appellants' decedent from making such flight.

There was no evidence presented by the appellants in this case that the appellee knew, or should have known, who was piloting the aircraft on the night in question. Furthermore, assuming that

St. Vrain was piloting the plane, there is no evidence that the appellee knew of his pilot qualifications because St. Vrain's own log book showed his last instruction at the appellee's airport to have been on September 13, 1959, almost four months prior to the fatal accident. St. Vrain could have taken flying lessons from many other sources and at many other different places after his last instruction at the appellee's airport.

An important fact in this case is that the airplane in question was owned by Pegasus, Inc., a flying club, of which St. Vrain was a member. *The appellee did not own the airplane which crashed.*

Cases relied upon by the appellants (*Farish v. Canton Flying Services* [1952], 214 Miss. 370, 58 So. 2d 915; *Weadock v. Eagle Indemnity Co.* [La. App. 1943], 15 So. 2d 132; and *Clark v. Chrishop* [1952], 72 Idaho 340, 241 P. 2d 171) all involve student pilots operating airplanes owned by the flying school. In each case the defendant had actual knowledge of the contemplated flights and of the identity of the pilots.

In *Farish v. Canton Flying Services,* supra, the relation between the airplane company and the pilot was that of teacher and student in the flying of airplanes, and it was held to be the duty of the company to exercise due care that the plane furnished was reasonably fit for the purpose or capable of the use known and intended, and that the student should be sufficiently instructed in the performance of his task in flying the particular plane. The degree of care was said to be the same in each case. Whether the plane in which the student pilot lost his life was supplied with sufficient gasoline for the flight; whether the student had been sufficiently instructed in the use of the particular plane; and whether the failure, if such, in either case, proximately caused or contributed to the death, were held to be issues for the determination of the jury.

In *Clark v. Chrishop,* supra, the action was against a flying school for the death of a student, qualified to fly solo but not qualified to be licensed as a private pilot. The student took off on a flight in a plane belonging to the school at a time when no employees of the school were present at the field to supervise the take-off. A former student of the school holding a private pilot's license was a passenger in the plane. The plane crashed and it was held the evidence was insufficient to show any negligence on the part of the school which was the proximate cause of the accident, or that it had any causal connection therewith.

In *Weadock v. Eagle Indemnity Co.*, supra, the flying school instructor directed the flight trainee, who had had 14½ hours of flying experience, of which 3½ hours or seven flights represented solo flying, to make a routine flight, and it was held the trainee could assume that conditions were favorable for such a flight with respect to the school operator's liability for injuries resulting from a midair collision with an airplane operated by a competing school's student, who was performing dangerous training maneuvers. The court held knowledge that the student had taken off and the nature of his flight was imputed to the trainee's instructor who, by the exercise of ordinary care, could have acquired such knowledge.

These cases do not apply to the facts here presented where the appellee furnished only hangar space for the airplane in question on a rental basis for the flying club. This was a contractual relationship whereby Ken-Mar leased hangar space to the Pegasus Flying Club in much the same manner as Ken-Mar leased hangar or field tie-down space to many other owners of private airplanes.

The president of Pegasus testified that at the time of the crash there were no arrangements between the club and the appellee as to the control of this airplane. He further testified that at the airport's administration building there was a keyboard upon which the flying club kept a key available for the benefit of all members, so that the key was available at all times. This keyboard was available as a service to the flying club or any other person owning an airplane which was hangared at the airport. On the night of the fatal crash no one came to the airport administration building to obtain the key on the keyboard.

There are few reported cases specifically spelling out the duties of an operator of a noncontrolled private airport. In *Weadock v. Eagle Indemnity Co.*, supra, an airport of this character was discussed. There the court said the functions of a control system at an airport are to assist in directing and controlling incoming and departing traffic for the purpose of preventing or reducing, as far as possible, accidents from collision. Such a system may consist of radios, lights or other visible signals. It was noted that few, if any, airports of the class and grade of that owned by the city of Shreveport, at the time of the accident, were equipped with a control system of any character. The institution of such a system anywhere had not been made compulsory by the C. A. A. in its general regulations, although recommended by it.

It was said the amount and character of traffic at an airport are the controlling factors in determining whether the institution of a control system is imperative as a safety measure. At the time of the accident traffic at the Shreveport airport had not reached the proportions deemed sufficient to require the system.

The court held, all things considered, that it was not negligence on the part of the operator of the airport to conduct the training school in the absence of a control system of some sort. The operator could not have instituted such a system himself without the city's consent and without the C. A. A.'s approval, and the fact that he did not request the city to do so created against him no inference of negligence. The court went further to say that should it be conceded *arguendo,* that the operator of the airport should have installed a control system of some character at the airport prior to continuing his school thereat, the student pilot who had full knowledge of this fact, assumed the risks obvious and patent, incident thereto.

In the instant case we think, all things considered, it was not negligence on the part of Ken-Mar to operate its airport in the absence of a control system of some sort.

The evidence is undisputed that Ken-Mar operates an airport for profit. As such it expressly and impliedly invites the public to its premises and to the use of its facilities. The flying club and its members were customers of Ken-Mar and by virtue thereof the relationship between Ken-Mar and the appellants' decedent was that of a proprietor and a business invitee. (*Mills v. City of Wichita,* 146 Kan. 772, 73 P. 2d 1054; *Plewes, Appellant v. Lancaster* [1952], 171 Pa. Superior Ct. 312, 90 A. 2d 279; and *Nave v. Hixenbaugh,* 180 Kan. 370, 304 P. 2d 482.)

The appellee concedes the operator of an airport is obligated to see that it is safe for aircraft and to give proper warning of any danger of which he knows or ought to know, and he is liable to the owner of a plane for damage sustained by reason of a violation of this duty. The operator of an airport, in particular, has a duty to keep the runway free from obstructions, so far as possible, or to place markers warning pilots of danger. (*Beck v. Wings Field, Inc.* [D. C. E. D. Pa. 1940], 35 F. Supp. 953; *Mills v. Orcas Power & Light Co.* [1960], 56 Wn. 2d 807, 355 P. 2d 781; *Stevenson v. Reimer* [1949], 240 Iowa 652, 35 N. W. 2d 764; and 6 Am. Jur. [Rev. Ed.] Aviation, § 28, p. 19.)

The appellants rely upon *Peavey v. City of Miami; Magic City Airways, Inc., v. City of Miami* [1941], 146 Fla. 629, 1 So. 2d 614, for the proposition that the operator of an airport must, when the conditions are unsafe, prevent the use of the facilities or at least give warning that the flight is unsafe. A study of the case does not reveal that its holding is as broad as the foregoing statement.

There the pilot and owner of an airplane brought an action against a municipality for injuries and damages received when his airplane collided with an unlighted road roller while landing at a municipal airport which was being improved with the pilot's knowledge. It was held the evidence justified judgments for the municipality on the ground that there was no showing the municipality had failed to exercise that degree of care required by law in the operation of an airport. The court held in the absence of statutes covering operation and management of airplanes at the time and place of accident, specifically applicable to the issue of negligence in the operation of an airport, the ordinary rules of negligence and due care obtain, and the common law rule that every person must use ordinary care not to injure another applies.

The hangaring of the particular airplane in question by Ken-Mar involves the legal principal of bailment. The cases are clear that the act of Ken-Mar in furnishing hangar space for the Pegasus airplane upon its premises created a bailor-bailee relationship between those parties. (*Ogden v. Transcontinental Airport* [1931], 39 Ohio App. 301, 177 N. E. 536.) The relationship of bailment was determined to exist under Kansas law in *Baruch v. Beech Aircraft Corporation* [U. S. C. A. 10th Cir. 1949], 175 F. 2d 1.

The *Baruch* case has a bearing on the facts in the instant case. There the plaintiff, Baruch, had purchased an airplane from the defendant, Beech Aircraft Corporation, at Wichita, Kansas. The pilot of the plaintiff came to Wichita with written authority to pick up the newly purchased airplane. Beech made delivery of the plane and prior to the pilot's delivery of the airplane to the plaintiff, the airplane was retained in a Beech hangar with Beech serving as gratuitous bailee. The plaintiff's pilot, prior to take-off, became noticeably intoxicated and representatives of Beech Aircraft attempted to discourage the pilot from flying the airplane in an intoxicated condition. The pilot refused to be restrained and upon take-off the plane crashed, killing the pilot and destroying the airplane. Action was subsequently brought by the plaintiff to recover

the value of the destroyed airplane from Beech. The judgment in favor of Beech Aircraft Corporation was affirmed on appeal. In affirming the decision of the lower court, the Circuit Court said:

"The trial court properly treated the relationship between Baruch and Beech as bailor and bailee, which required the surrender of the possession of the plane upon Baruch's agent's demand, and the use of its airport to take it off. The court specifically absolved Beech of any act of omission or commission, or indifference, amounting to a willingness to injure Baruch's property. . . ." (p. 3.)

The Kansas Supreme Court has generally recognized the duty of a bailee to redeliver property upon the demand of the bailor. (*Strange v. Price Auto & Service Co.*, 169 Kan. 98, 218 P. 2d 208.)

St. Vrain, as a member of the Pegasus Flying Club, was an owner of the airplane in question. As such Ken-Mar, even if it had full knowledge of the contemplated flight by St. Vrain and the appellants' decedent prior to take-off, would have had a duty as bailee to surrender possession of the plane upon demand and to allow the use of its airport for the take-off.

Another case discussing the liability of an airport operator is *Atcheson v. Braniff International Airways* [Mo. 1959] 327 S. W. 2d 112. This was an action by a widow against the city of Kansas City, Missouri, and Braniff International Airways for the wrongful death of her husband who was struck by a propeller of an airplane when he ran out on the ramp in an apparent attempt to stop the take-off. The Missouri court said in Syllabus ¶ 8:

"To constitute actionable negligence, there must be a duty which defendant is under to protect plaintiff from injury, a failure to perform that duty, and injury to plaintiff resulting from that failure."

The appellants have gone into great detail in attempting to set forth circumstances which would impose upon the appellee certain duties. The circumstances referred to by the appellants all contain the word "knew" and are based upon the alleged knowledge of the appellee. If some evidence had been produced at the trial to the effect that unqualified persons were flying from the airport in question at night, or that unqualified persons were flying with passengers when they were unauthorized to do so, or that St. Vrain had a prior course of conduct which indicated violations of the Civil Aeronautics regulations, the case might be different, but such is not the fact. The appellants' case must be based upon evidence, and the appellants cannot be allowed to impose a theoretical duty upon the appellee when there is no evidence present to support that position.

In this respect it is important to note that the appellants do not tell the court how the appellee is to carry out the duty which they seek to impose—the duty to ascertain the identity of any person taking the Pegasus plane at any time; and the duty to ascertain the qualifications of any person taking the Pegasus plane at night and under the conditions existing on this particular night. The appellants also fail to tell the court how the appellee should have warned a passenger of St. Vrain of the pilot's lack of qualifications. It should be pointed out that the appellee in no way disputes the fact that in making this flight, the Civil Aeronautics regulations were violated in several particulars. Nonetheless, the appellants' witness, Lowell Lehn, the janitor-flight attendant, upon direct examination testified as follows:

"Q. What effort did you make to determine who was in the plane?

"A. There wasn't anything I could do. The airplane taxied to the end of the runway before I could do anything. It was moving at the time I seen it."

In *Mathis v. Atlantic Aircraft* [1958], 216 Md. 262, 140 A. 2d 156, a business invitee upon the airport premises was struck by the rotating propeller of an airplane as it was taxiing upon the paved apron area at the airport. The action was brought for the personal injuries sustained against the operator of that particular portion of the airport, who was in the business of storing, maintaining, selling and renting airplanes much in the same manner as is the appellee in the instant case. There the court held that where the proprietor has reason to suspect from past experience that a third party is likely to be negligent, the proprietor will be liable for injuries resulting from such negligence; but where the proprietor had no indication that a third party was likely to cause harm, there would be no liability. The court also held that the airport operator was not obligated to anticipate that the pilot of an airplane would fail to make the "zigzag" movements necessary for proper forward observation in taxiing an airplane, and accordingly, the operator could not be held liable for injuries sustained by an appellee who was struck by the propeller of the airplane as it was being taxied on the apron area.

The Kansas Supreme Court has held that the proprietor of a trade or business is not an absolute insurer of the safety of its customers. (*Steinmeyer v. McPherson*, 171 Kan. 275, 232 P. 2d 236.)

Upon all of the facts and circumstances presented by the instant case, it is apparent the appellants seek to have a rule of law estab-

lished with respect to the operation of private non-controlled airports which will impose an absolute liability, and, in effect, make the operator an absolute insurer of the safety of persons using its airport.

The evidence in the case leaves much to speculation and conjecture, and we hasten to add that all avenues have not been explored or discussed in this opinion, not the least of which is the question of the contributory negligence of the appellants' decedent, Hendren. (See, *Adair, Adm'x v. Valley Flying Service* [1952], 196 Or. 479, 250 P. 2d 104, where the facts are strangely similar to those in the case at bar.)

The appellants rely upon G. S. 1949, 3-204, which reads as follows:

"The certificate of license required shall be kept in the personal possession of the licensee when he is operating aircraft within this state, and must be presented for inspection upon the demand of any passenger or any peace officer of this state, or any official manager or person in charge of any airport or landing field in this state upon which he shall land."

The appellants argue this statute shows a legislative recognition that the only way to regulate persons who are taking airplanes into the air, and thereby possibly endangering others, is at the place where the airplanes take off—the airport. The appellants contend that as a matter of fact the right granted by this section of the statute to the manager or operator of an airport or landing field to check the qualifications of a pilot carries with it a concomitant duty to do so. The appellants argue this provision in essence requires the presence of a responsible person in charge of an airport at all times where the public is permitted the use of the airport, and that the statute further requires such person in charge to exercise reasonable care to determine the qualifications of pilots using the airport to make intended flights.

This point is not well taken. To attempt to impose such duty upon an airport operator is to fail to read the statute as the legislature has written it. The statute says the certificate of license must be carried by the operator of the aircraft and must be presented "upon the demand" of a certain group of persons. There is no requirement that it be shown voluntarily. It must be shown only when demanded. It must be shown to any passenger, peace officer, official manager or person in charge of any airport or landing field in this state upon demand. The statute does not require the operator of an airport to check the certificate of license of any

pilot at any time. Instead, the statute gives proper parties authority to inspect the certificate of license of an aircraft operator under certain conditions if they desire to do so.

The appellants also note G. S. 1949, 3-202 and 3-203, which provide for the punishment of any person who navigates an aircraft within the state without a pilot's license issued by the Department of Commerce, and punishment for any person who navigates an aircraft within this state in violation of Air Commerce regulations. G. S. 1949, 3-205, makes such violations a misdemeanor and provides for a fine in a sum not exceeding $500 or confinement in the county jail not exceeding six months, or both such fine and imprisonment. In this case the pilot was taking with him a passenger in clear violation of the Civil Aeronautics regulations.

Ken-Mar was not bound to anticipate the criminal act of St. Vrain; and its failure to do so was not negligence. (See, 65 C. J. S., Negligence, § 111, at pp. 699, 700.)

For the reasons heretofore stated we hold the evidence of the appellants fails to establish a *prima facie* case against the appellee, Ken-Mar, on the ground of negligence. In short, the evidence fails to establish negligence on the part of Ken-Mar.

The judgment of the lower court is affirmed.