No. 46,279

CHARLES F. WEBER, *Appellant*, v. SOUTHWESTERN BELL TELEPHONE COMPANY, a corporation, and LOWELL STRICKLER and DIXIE STRICKLER, *Appellees.*

(497 P. 2d 118)

Opinion filed May 6, 1972.

*Gerald L. Michaud,* of Michaud, Cranmer, Syrios and Post, of Wichita, argued the cause, and *Orval L. Fisher* and *Bradley Post,* of the same firm, were with him on the brief for appellant.

*Charles W. Harris,* of Weigand, Curfman, Brainard, Harris and Kaufman, of Wichita, argued the cause, and *Wendell Snow* of the same firm, and *T. Larry Barnes,* of Topeka, were with him on the brief for appellee Southwestern Bell Telephone Company. *Alvin D. Herrington,* of McDonald, Tinker, Shaer, Quinn & Herrington, of Wichita, argued the cause, and *Norman I. Cooley,* of the same firm, was with him on the brief for appellees Lowell and Dixie Strickler.

The opinion of the court was delivered by

FATZER, C. J.: This was an action for personal injury arising out of the crash of a private airplane in which the plaintiff, Charles E. Weber (Weber), was riding as a passenger. He has appealed from the entry of summary judgment in favor of each of the defendants, Southwestern Bell Telephone Company (Bell), and Lowell Strickler and Dixie Strickler his mother (individually or as the Stricklers).

The following is a summary of facts disclosed by deposition testimony, answers to interrogatories by Bell and the Stricklers, and

statements and affidavits of the parties and witnesses, at the time the district court sustained the motions for summary judgment:

The accident occurred on Sunday afternoon, July 23, 1967, when the airplane in which Weber was riding was in the process of landing at the Strickler Airstrip three and one-quarter miles east of Nickerson. The weather was clear and warm and there was a slight wind from the south. The crash occurred when the landing gear of the airplane came in contact with certain telephone lines owned by Bell. When the airplane struck the telephone lines, it nosed down, turned over, and crashed near the north end of the airstrip.

To orient the reader, it may be said the telephone lines in question are located in the southeast quarter of Section 7, Township 22, Range 6, in Reno County, which was owned by the Fred Strickler estate at the time of the accident. The telephone lines run in an east-west direction, and are fourteen and one-half feet north of the right-of-way of Old K-96 Highway. The highway is both a section line road and a paved highway. The Strickler airstrip is located south of, and across the highway, in a 50 or 60 acre prairie grass pasture in the northeast corner of the northeast quarter of Section 18, Township 22, Range 6, in Reno County, which was also owned by the Fred Strickler estate and rented by Lowell Strickler from his mother Dixie Strickler, executrix of the estate of her deceased husband Fred D. Strickler. K-96 highway turns south at the northeast corner of Section 18, and the area is known as "Stricklers' Corner," but it is also referred to as "Stricklers' Airstrip."

The airplane involved was an experimental aircraft known as the "Bluey Sport." It was piloted by Roscoe V. Huey, one of the owners and builders of the plane. The aircraft was an open cockpit, single engine, tricycle gear, high wing airplane, with dual controls and could be flown from either of its two seats, except that pedals to brake the plane were on the left or pilot's side of the aircraft. The airplane was in excellent mechanical condition at the time of the crash, having been approved by the Federal Aviation Authority, and was currently certified by the FAA. Huey was a private pilot, having been licensed since about 1949, and he was certified to operate the aircraft. Huey was killed in the crash, and Weber, a licensed student pilot with some forty hours of flying time, was permanently and severely injured.

The Strickler Airstrip has been in existence since about 1930, and has been continually used for the landing and taking off of private airplanes. The airstrip has a runway 2200 feet in length which runs in a north-south direction, and is referred to as a "sod strip," meaning prairie grass which is kept mowed. It is 72 feet wide, the north end of which is about 90 feet south of the north boundary of the pasture. Over the years Fred Strickler, deceased, permitted his son Lowell and some of their friends to keep private aircraft at the airstrip, and several of them had built hangars for their airplanes. Lowell and his friends who kept their planes at the field, kept the grass mowed on the airstrip and leveled the strip by filling badger and gopher holes, and so forth. At the time of the accident, eight people were permitted to keep their planes at the airstrip. Only one of the hangers was enclosed on all sides. This was owned by James Foster who housed his plane in the hangar. Foster had a written agreement with Fred Strickler permitting him to build his own hangar but to pay no rent, and Lowell Strickler was permitted to use part of the hangar to house his own airplane. When the crash occurred, there were four other "T" hangars on the airstrip, and another was incomplete. All of the buildings were privately owned by Strickler's friends and erected at their own expense. None of the hangars were available for rent or used by the public in general. Strickler received a nominal remuneration from some of his friends to offset the loss of any pasture area resulting from building hangars at the field. The total payments Strickler received were usually less than $50 in any one year, and never exceeded $125 in any given year.

Shortly after Foster was permitted to keep his plane at the airstrip, he and other persons who owned planes smoothed up the field and placed old tires Foster had painted white at the ends and sides of the airstrip to outline the runway. There is a windsock to show wind direction, but there has never been a control tower or traffic control of any kind. There were no radio facilities for air-to-ground or ground-to-air communications, except Foster had a personal citizen's band radio between his home, car, and his hangar. The airstrip had no tiedowns, hangar facilities, repair facilities or gasoline or oil, or any other maintenance or service facilities available for use by the public or transient aircraft. No landing fees were ever charged, nor were any flying instructions given for a charge. No product or service was offered

or available for sale to the public. The airstrip had never been advertised by signs or otherwise, as open to the public or transient aircraft. It was not listed or shown on any aeronautical or other maps, charts or directories as even an emergency landing area. No governmental agency had indicated that the airstrip was in any way subject to, or regulated by, any governmental agency. Lowell Strickler did not attempt to, nor did he make any profit from the airstrip. The only profit which he made, or attempted to make, was in connection with the use of the pasture to graze his dairy cattle. The only persons who were invited to the airstrip were friends who were invited for social purposes.

Numerous aircraft have landed at the airstrip over the years, and, with the exception of Foster, Strickler placed limited restrictions upon those persons he permitted to house aircraft at the field concerning their invitations to other pilots to land. However, there was an open invitation to members of the Experimental Aircraft Association (EAA), of which Lowell Strickler, James Foster, Tommy George, Colonel Marion Unruh, Huey and Weber were members, to fly to the airstrip at their pleasure and convenience, and unannounced. Similar invitations had been issued by other EAA members who owned private airstrips in that part of the state. The EAA is a voluntary national association having state and local chapters. Strickler had been a pilot since 1949, and was active in organizing EAA in Kansas; he was a charter member, had served on various committees, and had undertaken, as most of its members had, to build his own airplane. The primary purpose of EAA is to permit members to meet and discuss the construction and performance of experimental airplanes, and Strickler's invitation to members of the association took on some of the characteristics of invitations issued by Mae West to, "come up and see me sometime," that is, "if you are in my area on a Sunday afternoon, drop in and see me."

Over a period of four or five years, Strickler had expressly invited George and Huey to visit him at the airstrip, and George had flown to the airstrip on several occasions. Huey had driven his automobile to Strickler's home to attend EAA meetings, but he had not previously landed a plane at the airstrip. The evidence showed that when Strickler invited members of EAA to drop in and see him, he had a practice of always warning them of the obstruction of the telephone lines at the north end of the runway.

The record shows that on several occasions Huey had been expressly warned about the telephone lines and to watch out for them.

The evidence also showed that occasionally Weber attended chapter meetings of EAA. Strickler testified he did not know Weber but had seen him at meetings—he could not place his name with anyone he knew. Strickler never personally invited Weber to the airstrip; however, Weber might have been in a group at an EAA meeting when those present were invited to the field. Weber testified he did not personally know Strickler, but had seen him at one EAA event in Illinois, and that any invitation Strickler might have given "was on a friendly, social type basis," and "like you would invite somebody to come to your home." Foster testified that at a recent EAA meeting before the accident, "we asked them to come over," and that "they had all been warned of the telephone wires at the north end of the field." While the record does not show whether Weber was present at any EAA meeting when Strickler would extend his invitation to visit the field, it is clear from the evidence that if he was present at such a meeting and heard the invitation, he would have also heard Strickler's or Foster's warning about the telephone lines north of the runway, and to watch out for them.

There was never an organized flying event at the airstrip where a number of pilots were invited to attend. Sometimes there were three or four planes at the field on a nice Sunday afternoon. However, Strickler did not invite a lot of people into the area either by ground or by air, because there was limited parking facilities and the road to the airstrip was a "field crop road"; if there was too much travel, the ground would tend to blow. Also, there were 20 to 30 head of cattle in the pasture, and he worried about strange pilots not being used to cattle grazing in the pasture.

On the day of the crash, the Stricklers were not at home and they did not know Colonel Unruh intended to fly to the airstrip, nor did they know that, as hereafter detailed, George, Huey and Weber were flying to the airstrip that afternoon in search of Colonel Unruh.

As indicated, the telephone lines in question were located fourteen and one-half feet north of the right-of-way of old K-96 Highway, and 165 feet north of the north end of the runway. The telephone line was originally constructed in 1902 or 1903, by the Nickerson Telephone Exchange. In 1949, a drainage district was formed, and the district obtained an easement from Strickler's

grandfather to widen and deepen the ditch on the north side of the highway. The telephone lines had to be moved farther north and onto the Strickler land, to permit the widening of the ditch. In 1953, Bell purchased the lines from the Nickerson Telephone Exchange, and ten or twelve years ago Bell replaced the lines with new poles and new lines. The poles were a foot or two higher than the old poles, and were also spaced farther apart. The old lines were replaced by four strands of heavy gauge, high strength steel wire permitting longer spans and fewer poles. The record shows that Bell had made repairs on the poles and lines subsequent to their replacement in 1953, as part of its normal maintenance procedure. However, the district court precluded discovery of maintenance and changes in the poles and lines more than four years prior to the accident, and that factual issue remains in the case.

The telephone lines in question consisted of wooden telephone poles, approximately eighteen to twenty feet high, with crossarms holding the four strands of wire. The poles are approximately 455 feet apart, and with reference to the runway south of the highway, one pole is located in the approach pattern approximately 20 feet west of the east side of the airstrip. The telephone lines are not visible when one is attempting to land an airplane at the airstrip until it is too late to take any evasive action, or do anything to avoid hitting the lines. The evidence was undisputed that a pilot could not see the wires until you were on top of them, and passing over them." The pole in front of the runway is brown in color blending into the horizon. Likewise, the crossarms on the poles are not visible during an approach since the end of the crossarm is all that is visible to a pilot. There were no markings or warnings of any kind on the telephone poles or the lines to warn of their existence.

Weber contended he had physical evidence to prove it was a common practice in the industry to use markers and reflectors on the telephone poles and lines such as those involved in this case, to warn unsuspecting air travelers, and that such equipment was inexpensive. Weber advised the district court of such evidence, but summary judgment was entered before it was obtained.

In addition, there was a sharp factual conflict concerning Bell's right, or lack of right, to maintain its lines in their location on the Strickler property. An earlier contention that Bell owned an easement was abandoned for the contention that it had acquired

prescriptive rights. In any event, Bell did not have a right-of-way agreement, and the evidence disclosed a factual issue as to whether Bell was a trespasser or a licensee. Bell owned and maintained the poles and lines with knowledge of the airstrip's existence and the property rights of the defendants Lowell and Dixie Strickler. Whether Bell was a tenant at sufferance, or at will, or had acquired prescriptive rights, was not established by the evidence, and that factual issue remained.

Strickler and Foster had discussed the matter of the telephone lines many times, and both knew the dangers and hazards the lines presented to air travelers. Likewise, other persons housing planes at the airstrip knew the lines were dangerous and hazardous and had discussed this among themselves. Both Strickler and Foster had experienced "close calls" with the telephone lines in landing and taking off from the airstrip.

Prior to the time the lines were sold to Bell, Strickler talked with the manager of Nickerson about lowering or burying the lines north of the runway. Strickler was advised the company was selling to Bell. Later, Strickler talked with Bell linemen in the area concerning the lines, and was told to see the supervisor in Hutchinson. Strickler once stopped in Hutchinson to see the manager, but he was not there.

After Foster started using the airstrip, Strickler left it up to him to contact Bell's manager in Hutchinson to see what could be done about eliminating the dangers presented by the poles and lines in question. On at least two different occasions before the crash occurred, Foster talked with the manager in Hutchinson to put Bell on notice again about the dangers and hazards presented by the lines, and requested the removal or burial of the lines. Those meetings and conversations were denied by Bell, and that factual issue remained. Notwithstanding those conferences, which were clearly established by the plaintiff's evidence, Bell failed to take any action to remedy the hazards created by the poles and lines, either by lowering or burying the lines, or by moving the pole north of the runway to the east.

At the time the district court sustained the motions for summary judgment, there had been no final pretrial conference, discovery had not been terminated, and the defendants were informed that Weber proposed to present expert testimony with respect to airport hazards.

On the morning of the accident, Weber drove to Huey's home at Valley Center, about 7:10. He and Huey then flew in the Bluey Sport to a "fly in" of EAA members at Kingman. After the "fly in," they left Kingman about 1:00 or 1:30 p. m. They planned to return to Wichita at that time, but Tommy George, who piloted another plane and who flew to Kingman with them, wanted to talk to Colonel Unruh for a few minutes and look over an airplane the Colonel was building. The plaintiff testified he and Huey were simply "tagging along behind Tommy George." He didn't want to see Unruh, although he and Huey would have looked at the airplane the Colonel was building. Both airplanes landed on the Colonel's landing strip located on his farm. After the two planes landed, Mrs. Unruh told them the Colonel was at Strickler's. Neither Huey nor the plaintiff had previously flown to Strickler's, but Tommy George had flown there before, and led the way. Both Huey and George were in control of their own airplanes. The only reason the plaintiff and Huey were going to Strickler's was that they were following George who wanted to see Colonel Unruh. The plaintiff testified, "I was just along for the ride."

George was in the lead aircraft, and when they arrived over Strickler's airstrip, he pointed down at the field. Both airplanes were traveling in a northerly direction. George flew over the field and Huey flew the Bluey Sport to the east of the field in a northerly direction. Huey then flew a left-hand pattern, turned south in a normal approach to the airstrip, and was in the process of landing when his airplane came in contact with the telephone lines and crashed across Old 96 Highway. As stated, Huey's approach was normal, and had the lines not been present, the accident would not have occurred. Two lines and the pole were broken, and two lines followed the airplane all the way to the ground.

On the date of the accident, Strickler and his wife, and Dixie Strickler were not at home. They had driven to Wichita to meet and have dinner with a relative from Chicago. As indicated, the Stricklers did not know that Colonel Unruh was coming to the field, nor did they know Tommy George, Huey and Weber were coming. They heard about the accident on their car radio on their way home from Wichita.

The appellant contends the district court erred in sustaining both appellees' motion for summary judgment because the depositions,

answers to interrogratories, admissions on file, together with the affidavits, show that a genuine issue of material fact exists as to the legal relationship of the appellees to the appellant; further, that he was foreclosed from completing discovery as he had expert testimony concerning Bell's duty in the industry to mark its lines and poles immediately north of the airstrip. No contention is made concerning the Stricklers with respect to the latter point, or that discovery was incomplete concerning the legal relationship of the Stricklers to the appellant.

K. S. A. 60-256 (c) prescribes the standard whether summary judgment should be granted. This court has held that before summary judgment may be granted, the record must show that there remains no genuine issue as to a material fact; that when ruling on a motion for summary judgment, the district court must resolve against the movant when any doubt exists whether there remains a genuine issue of material fact, and that the evidentiary material presented by the party opposing the motion must be taken as true, and such party given the benefit of all reasonable inferences from such evidence. (*Brick v. City of Wichita*, 195 Kan. 206, 403 P. 2d 964; *Green v. Kaesler-Allen Lumber Co.*, 197 Kan. 788, 420 P. 2d 1019; *Jarnagin v. Ditus*, 198 Kan. 413, 424 P. 2d 265; *Knowles v. Klase*, 204 Kan. 156, 460 P. 2d 444; *Johnson v. Farha Village Supermarkets, Inc.*, 208 Kan. 241, 491 P. 2d 904.) In *Secrist v. Turley*, 196 Kan. 572, 412 P. 2d 976, this court stated the purpose 60-256, "is to obviate delay where there is no real issue of fact," and further said:

"In the final analysis a court should not determine the factual issues on a motion for summary judgment but should search the record for the purpose of determining whether a factual issue exists. If there is a reasonable doubt as to the existence of a material fact a motion for summary judgment will not lie. No matter how the explanation of the rule is phrased we always return to the language of the rule, there must be left 'no genuine issue of any material fact.'

"The proper application of the rule leaves but two rather simple questions for determination, *i. e.*, what is a 'genuine issue' and what is a 'material fact?' The answer as to what constitutes a 'genuine issue as to any material fact' appears to account for most of the voluminous opinions on the questions.

"It may be said that an issue of fact is not genuine unless it has legal controlling force as to a controlling issue. A feigned or imaginary issue is not a genuine issue. A disputed question of fact which is immaterial to the issues does not preclude summary judgment. If the disputed fact, however resolved, could not affect the judgment, it does not present a genuine issue of a material fact. It has been said that before summary judgment is granted the court

must be convinced that the issue is not genuine, or there are only immaterial or imaginary factual issues." (l. c. 575, 576.)

In *Albright v. McElroy*, 207 Kan. 233, 484 P. 2d 1010, we quoted from 3 Barron and Holtzoff, Federal Practice and Procedure, rules edition, § 1234, as follows:

" ' "Normally where the only conflict is as to what legal conclusions should be drawn from the undisputed facts, a summary judgment should be entered [p. 128.] . . . It has been said that an issue is material if the facts alleged are such as to constitute a legal defense or are of such nature as to affect the result of the action, or if the resolution of the issue is so essential that the party against whom it is resolved may not prevail. . . . It has been said that a genuine issue is one which can be maintained by substantial evidence. Where the pleadings or proof of either party disclose that no cause of action or defense exists, a summary judgment may be granted. [pp. 131-132.] . . . A popular formula is that summary judgment should be granted on the same kind of showing as would permit direction of a verdict were the case to be tried. [p. 133.] . . . If there is any question as to the credibility of witnesses or the weight of evidence, a summary judgment should be denied.' " (p. 134)" ' " (l. c. 244.)

The thrust of the defense of the appellees is that the controlling legal issues in this case are governed by "premises law," which immunizes each of them from liability. To ascertain the validity of the various contentions of the parties, we examine separately the available facts as to each appellee to determine whether there was a genuine issue of material fact concerning the liability of either of them.

We first turn to Weber's claim against the Stricklers and that the airstrip was maintained as a commercial enterprise, and to *Hendren v. Ken-Mar Airpark*, 191 Kan. 550, 382 P. 2d 288, upon which he relies; that the structures, terrain and airport equipment maintained on the premises by Strickler constituted an implied invitation to air travelers; that Strickler's open invitation to all members of EAA was related to the activities of its members to meet and exchange their talents and experiences concerning the building of their own airplanes, and that such projects were more than social reasons and ventures; that Weber was a business invitee enroute to Strickler Field at the time the airplane in which he was a passenger came in contact with the unseen telephone lines and was injured when the plane fell to earth upon the airstrip which was operated by Strickler; that Strickler knew of the hazards and dangers created by the telephone lines at the north end of the airstrip, and that failure to warn meant probable death or

serious injury to any air traveler attempting to land at the airstrip unless warned of the unseen danger, hence, Strickler's express invitations to visit his airstrip without warning of the hazards and dangers known to him, but unknown to Weber, constituted willful, wanton and reckless conduct, and that Strickler, knowing of the hazards and dangers presented by maintaining the airstrip, in conjunction with the telephone lines existing to the north, and having directed Foster to act in his behalf to get Bell to bury the lines, and knowing that Foster had conferred twice with Bell's manager, and thereafter Strickler did nothing because of his and Bell's economic reluctance to remedy the dangerous condition, constituted a trap to those whom he invited to the field without warning of the hazards.

Strickler contends the status of the plaintiff as a visitor to his land is the central point of the action; that the district court rendered summary judgment in his favor upon the ground the undisputed facts showed Weber was at most a licensee—a social guest; that the duty Strickler owed him as a licensee was to refrain from willful, wantom or reckless conduct, and that based upon the record, Strickler did not breach the applicable standard of care with respect to Weber—assuming the telephone lines across the road from the landing strip constituted hazards and dangers known to Strickler, and even assuming the evidence presented an issue of fact whether Strickler warned the plaintiff of such hazards and dangers, since failure to warn under *Duckers v. Lynch*, 204 Kan. 649, 465 P. 2d 945, constituted at most passive negligence, not amounting to willful, intentional, or reckless conduct sufficient to enable Weber to recover in this case.

Weber's contention the airstrip was maintained as a commercial business enterprise is not well taken. Its physical characteristics, as well as the facts surrounding its maintenance and operation, have been fully set forth. The evidence need not be reiterated, and this court concludes the airstrip was not a commercial business venture in which Strickler impliedly invited visiting aircraft to the field on the basis it was operated for profit, or was maintained as a facility open to public use, and that those who ventured there were business invitees which would impose upon Strickler a duty to keep the premises in a reasonably safe condition for use of those pilots and aircraft which he knew or should have known would fly to the airstrip and use its facilities. Weber's reliance upon

*Hendren v. Ken-Mar Airpark,* supra, is not in point. It is unnecessary to discuss the case at length, but it is sufficient to say the airport there was incorporated and operated for profit; as such, it was held there was an express and implied invitation to the public to use its premises and facilities—that clearly is not the case at bar. Further reference to *Ken-Mar Airpark* is unnecessary since it does not control the disposition of this lawsuit.

Likewise, Weber's contention Strickler's open invitation to all members of EAA was related to the activities of its members to meet and exchange their talents, experiences and discuss the performance of experimental aircraft was more than a social venture or purpose (*Well v. Smith,* 205 Kan. 339, 469 P. 2d 428), thus affording substance to his argument that he was a business invitee on the day of the accident, also is not well founded. Assuming, as Weber contends, the purpose of the EAA meetings was for the mutuality of interest and advantage of an owner of an airstrip and to the members of EAA to exchange experimental data with respect to the construction and design of airplanes, the meeting at Kingman on the Sunday in question had terminated either at 1:00 or 1:30 p. m., and any economic or business purpose of the meeting ceased to exist. Huey and Weber intended to return to Huey's home at Valley Center. However, Tommy George suggested he wanted to see the airplane Colonel Unruh was reported to be building and to visit with the Colonel for a short time. George asked Huey and Weber to accompany him, which they did. The record shows they were "merely tagging along," and when Colonel Unruh was not at his home and they were told he was at the Strickler airstrip, the plaintiff's own testimony shows he was simply "going along for the ride." Neither he nor Huey had any purpose to see Colonel Unruh, and for that matter, had no reason to go to Strickler's airstrip other than to "tag along" following Tommy George who wanted to see the Colonel. Neither Huey nor Weber had business relations to discuss with Strickler or anyone else who might be at the airstrip. It is clear the purpose of Weber's visit to the airstrip was purely social and for his own convenience and pleasure. He was, in the eyes of the law, a licensee. (*Lemon v. Busey,* 204 Kan. 119, 461 P. 2d 145; *Weil v. Smith,* supra.)

It is unnecessary to reiterate at length the law as stated in our decisions as to the legal status of a person who enters or remains upon the land of another whether by invitation or permission—a

licensee—and the duty owed to him by the owner or occupier. That duty is to refrain from willful, wanton, intentional or reckless conduct that might result in his injury. (*Ralls v. Caliendo,* 198 Kan. 84, 422 P. 2d 862; *Roberts v. Beebe,* 200 Kan. 119, 434 P. 2d 789; *Weil v. Smith,* supra; *Lemon v. Busey,* supra; *Duckers v. Lynch,* supra.)

What degree of negligence the law considers equivalent to a willful or wanton act is as hard to define as negligence itself. In the nature of things, it is so dependent upon the particular circumstances of each case as not to be susceptible of general statement. Conduct which will justify the presumption of willfulness or wantonness is such as to imply a disregard of consequences or a willingness to inflict injury. In *Mathes v. Robinson,* 205 Kan. 402, 469 P. 2d 259, it was said:

"It is fundamental that the law is regardful of human life and personal safety, and if one is grossly and wantonly reckless in exposing others to danger, it holds him to have intended the natural consequences of his acts or omissions, and treats him as guilty of willful and wanton wrong. Our cases hold that one with knowledge of existing conditions, and conscious from such knowledge that injury or death will likely or probably result from his conduct, and with reckless indifference to the consequences, consciously does some act, or omits to discharge some duty, which produces the injurious result, is sufficient to establish willful or wanton conduct . . ." (l. c. 405.)

Strickler knew of the hazards created by the telephone lines and considered them one of danger for which a warning was required to be given to persons he invited to the airstrip—to air travelers who were not familiar with the field or the condition and terrain surrounding it. Assuming Weber was at an EAA meeting and heard Strickler's express invitation to visit his airstrip, it is clear from the record, as indicated, he would have also heard Strickler's or Foster's warnings to watch out for the telephone lines north of the runway. In addition, the record shows Huey was expressly warned on several occasions of the hazards and dangers produced by the telephone lines in landing or taking off from the airstrip, and that warning was also conveyed to all who were present at EAA meetings when Strickler invited them to fly to his airstrip. The purpose of a warning is to give notice of the condition. In *Albright v. McElroy,* supra, it was said:

". . . The function of a warning is simply to convey knowledge or notice. The particular manner in which defendant warned plaintiff . . . is immaterial if in fact effective notice was given. . . ." (l. c. 245.)

Viewing the facts in their most favorable light to the appellant, it is clear Weber, as a licensee, was owed a duty to be warned of the hazards of the telephone lines; but it is likewise clear that Strickler fulfilled that duty. There is no genuine issue of material fact existing concerning the character of the warning given by Strickler and Foster, and it follows that if Weber heard the invitation, he also heard the warning. The appellant does not contend that additional discovery is required to further define the legal relationship between the Stricklers and him. Based upon the admissions and the undisputed testimony, this court is of the opinion the district court did not err in sustaining the motion for summary judgment on behalf of Lowell and Dixie Strickler.

Bell contends it is entitled to the benefits of the general rules of law pertaining to persons who enter upon the land of another, and that if the appellant's status as to the Stricklers was one of licensee, then it too, as an occupier of the land where its lines were located and the airspace above, was subject to the same liability, and enjoyed the same freedom from liability, as the Stricklers, and it owed only a duty to refrain from willfully, wantonly, intentionally, or recklessly injuring Weber. The district court sustained Bell's motion for summary judgment upon the theory the "premises law" was applicable under the facts and circumstances, and concluded as a matter of law that Bell's only duty to Weber was to refrain from willfully, wantonly, intentionally, or recklessly injuring him.

As indicated, there was a substantial factual dispute as to Bell's right to maintain the lines in their location on the Strickler property. Bell's contention it had an easement was abandoned, and there is nothing to indicate it acquired any rights by purchase or eminent domain. Its rationale is that it had an easement by prescription; however, what is apparent is that Bell acquired permission to run its lines parallel to the highway merely with the consent, expressed or implied, of the landowner, and such a permissive right exists only at the owner's will and tolerance. Although circumstances may exist where such a permissive right takes on the characteristics of a prescriptive easement, the record does not support Bell in that respect, and we are of the opinion its status on the land was one of a continuous revocable licensee as to the landowner. (*Jobling v. Tuttle,* 75 Kan. 351, 89 Pac. 699; *Fiest v. Steere,* 175 Kan. 1, 259 P. 2d 140; *White v. Mississippi Power & Light Company,* 196 So. 2d 343 [Miss.].)

This court questions the logic of a rule that would place Bell within the legal category that it contends is applicable. Due to the nature of the occupancy ostensibly held by Bell, it would be difficult to imagine facts and circumstances under which it would owe any duty to a person entering upon its occupancy or the airspace above, other than that owed a trespasser or at best a licensee. The only purpose of Bell's occupancy on the Strickler land is to further its own business interests. There would be little or no economic or business reason for any person to enter upon Bell's occupancy so as to afford him the status of an invitee as contemplated by the "premises law." Moreover, it would be equally as pervasive to consider circumstances under which anyone would enter upon Bell's occupancy as a social guest to be afforded the status of a mere licensee. The use of "premises law" to delineate Bell's duty would in effect define out of existence any affirmative duty it owed to maintain its lines so as not to create or permit dangerous conditions to exist that might cause injury to the public. In short, we conclude that the "premises law" does not provide a functional test to define the legal relationship that Bell had with the appellant, and we decline to use that approach as a solution to this lawsuit.

Since we hold that Bell may not enjoy the benefits of rules of law pertaining to landowners within the context of this case, it follows that the rules found in *United States v. Causby*, 328 U. S. 256, 90 L. Ed. 1206, 66 S. Ct. 1062, and cases following those rules, to the effect that an air traveler may be classified as a trespasser, are not applicable here. The *Causby* rationale supports the proposition that the use of "premises law" is unwarranted and wholly inapplicable to aircraft granted a privilege to fly within the navigable airspace. Air travelers may fly over the land without having attached to them the connotations of trespasser, licensee, or invitee —such as liability for trespass or degrees of duty owed persons depending upon the nature and purpose for which they entered upon the land. (*Mills v. Orcas Power & Light Co.*, 56 Wash. 2d 807, 355 P. 2d 781.)

The case of *Hendren v. Ken-Mar Airpark*, supra, is not helpful to Bell since the only standard of care discussed was that which the operator of the commercial airport owed to the air traveler— the duty of public utility companies was not raised, or discussed.

While cases concerning the legal status of air travelers who are

injured as a result of contact with the lines of public utility companies found in other jurisdictions indicate that the authorities are split on the question, this court, considering the matter on first impression, is of the opinion it should adopt and follow the great weight of authority to the effect that a public utility company is not relieved of liability to such persons injured as a result of contact with its lines, where the proximate cause of such injury can be attributed to its negligence in construction, inspection, or maintenance of its lines, upon the theory the person injured was a licensee or trespasser on a third party's land.

We conclude that a public utility company must exercise reasonable care and precaution to prevent injury, not only to persons who have a right to be on the land or in the airspace above where the injury occurred, but also to persons whom the company should reasonably have anticipated might be present and exposed to danger at that location. The standard of care applicable, that of ordinary negligence based upon the foreseeability of the injury, will be complied with if the company provides such protection as will safely guard against any contingency that may be reasonably anticipated. What is contemplated is that the company is not legally bound to safeguard against occurrences that cannot reasonably be expected, nor do we intend it should be liable as an insurer. Under such circumstances, the company ought not be permitted to escape liability for injury actually inflicted, as a proximate cause of permitting such a danger to exist, merely because the injured party was a trespasser or licensee insofar as a third party landowner may be concerned. (*Mills v. Orcas Power & Light Co.*, supra; *Yoffee, Aplnt. v. Pa. Power & Light Co.*, 385 Penn. 520, 123 A. 2d 636; *Arizona Public Service Company v. Brittain*, 107 Ariz. 278, 486 P. 2d 176; *White v. Mississippi Power & Light Co.*, supra; 52 Am. Jur., Trespass, § 84 [1944]; Anno. 30 A. L. R. 3d 777.)

In the *Yoffee* case, the Supreme Court of Pennsylvania summarized the duty of a public utility company, and said:

". . . If the owner of any instrumentality, equipment, or device has reason to believe or expect that an airplane will use the legalized unoccupied air space above his installation and he erects or permits to exist an obstruction which, without fault on the part of the aviator, will do damage to the pilot or his aircraft, the owner of the installation will be as responsible for the damage done the aircraft and its passengers as if he had shot down the aircraft. . . ." (p. 541.)

Applying the foregoing rules, there remains the question of fact to be submitted to a jury, whether Bell should have reasonably anticipated that persons attempting to land at the airstrip might come in contact with the telephone lines and be injured as a result of its negligence in the construction, inspection, or maintenance of its lines at that location. Subsidiary to that, and going to the issue of foreseeability, is the question whether Bell had been warned by Strickler or Foster as to the dangers inherent in the wires being strung at that location.

There remains the question whether Bell had a duty in this case, as a matter of law, to mark the lines in such a manner as to warn aircraft of the existence of the telephone wires to the north of Strickler's airstrip. Jurisdictions are also split on this issue, some holding there is no duty (*Columbia Helicopter, Inc. v. U.S. By and Through Bonneville Power Administration [Dept. of Interior]*, 314 F. Supp. 946 [D. C. Or.]), while other authorities recognize that such a duty exists. (*Yoffee, Aplnt. v. Pa. Power & Light Co.,* supra; *United States v. State of Washington,* 351 F. 2d 913 [9th Cir.]; *El Paso Natural Gas Co. v. United States,* 343 F. 2d 145 [9th Cir.]; *Arizona Public Service Company v. Brittain,* supra.) Each of those cases turned upon its own complex factual pattern, and this court is of the opinion that such a question should not be decided as a matter of law. Foreseeability is the foundation of liability in the instant case, and we conclude that the duty to mark the lines is also a question for the trier of fact.

The judgment of the district court is affirmed as to Lowell and Dixie Strickler, and reversed and remanded as to Bell with directions to the district court to proceed in a manner consistent with this opinion.

It is so ordered.